Filed 6/5/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S115284 |
| v. | ) | |
| | ) | |
| DUNG DINH ANH TRINH, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 99NF2555 |
| _____ | ) | |

A jury convicted defendant Dung Dinh Ahn Trinh (Trinh) of three counts of first degree murder with a multiple-murder special circumstance, one count of attempted murder, and various firearm enhancements for the shootings and attempted shooting of four staff members at an Anaheim hospital. (Pen. Code, §§ 187, 189, 190.2, subd. (a)(3), 664.)[1] Trinh's first two penalty trials resulted in hung juries, but the third penalty jury returned a death verdict. On automatic appeal, we affirm the judgment in its entirety.

---

[1] All further unlabeled statutory references are to the Penal Code.

# I. Factual and Procedural Background

## A. Guilt Phase Trial

### 1. *Prosecution Evidence*

On the morning of September 14, 1999, Trinh's mother, Mot Trinh (Mot) died of cardiac arrest.  A few hours later, shortly after 10:30 a.m., Trinh entered the West Anaheim Medical Center (West Anaheim), where Mot had been a patient in May and June 1999.  He was armed with two .38-caliber handguns and more than 100 rounds of ammunition.

Hospital employees saw Trinh walk down a second-floor hallway and turn into the office of nursing supervisor Mila Salvador.  Salvador was in conversation with a nurse's aide, Marlene Mustaffa.  Trinh shot Mustaffa in the head from a foot away.  He then pointed a gun at Salvador and fired but missed.  Trinh immediately left.  Salvador barred the door to her office, attempted to resuscitate Mustaffa, failed, and called 911.

The firing of shots triggered a "code gray" announcement over the hospital public address system, a warning that generally signaled the presence of an unruly patient.  The announcement directed male personnel to respond immediately to the progressive care unit on the second floor.  Andrew Armenta, working on the first floor, saw Vincent Rosetti running toward a stairwell leading to the second floor and ran behind Rosetti to the stairwell.  At the bottom of the stairs, he heard three shots, stopped, and retreated.  Rosetti's body was later found in the stairwell; he had been shot in the head and neck from a foot or two away.

Staffers Norman Bryan and Ronald Robertson also responded to the code gray from the first floor.  As Bryan and Robertson approached the stairwell to the second floor, they heard a gunshot.  Bryan turned to evacuate employees, while Robertson ran to close off the first-floor lobby doors.  As Robertson was trying to

close the doors, Trinh approached him and shot him in the chest. Robertson grabbed Trinh and they fell to the ground. Trinh shot Robertson again. Staffer John Collins and patient Joseph Nuzzo joined in and together pinned down Trinh. While he was being held, Trinh said twice, "They killed my mother" or "You killed my mother." Two handguns, a pouch, and bullets were scattered across the floor; staffer George Wilhelm picked up the guns and locked them in an office. Robertson was taken to the emergency room, where he died.

Police responding to the scene took Trinh into custody. After being placed in the back of a patrol car, Trinh stated angrily, "You American people kill my mother. Now I kill you. You kill my people. I kill you. You know, you just kill my mother. Right now she lay at Martin Luther Hospital by herself. You kill her."

A search of Trinh's truck revealed a map with Martin Luther Hospital circled on it and empty boxes of ammunition. Examination of the handguns and ammunition captured inside West Anaheim showed that one .38-caliber handgun contained spent casings while the other was fully loaded. The pouch Trinh had been carrying contained more than 100 additional rounds of .38-caliber ammunition.

> 2. *Defense Evidence*

The defense conceded Trinh had shot and killed Mustaffa, Rosetti, and Robertson, and had attempted to shoot Salvador, but presented evidence regarding stressors in Trinh's life that it argued mitigated Trinh's culpability to less than first degree murder.

Trinh and his mother Mot immigrated from Vietnam in 1975, when Trinh was roughly 18. As of 1999, Trinh and his mother had lived together in an apartment in Anaheim for a long time.

In late May 1999, Mot, then 72, collapsed and lost consciousness while Trinh was taking her to the bathroom. She was transported to West Anaheim and stayed there approximately one month. During that time, she underwent hip replacement surgery and on several occasions spent time in intensive care after becoming nonresponsive. Trinh was frequently with Mot at the hospital and fed her, assisted in her care, and acted as her interpreter with staff.

Thereafter, Mot was transferred to La Palma Intercommunity Hospital (La Palma) for an additional month of care and rehabilitation. Trinh was again with her on a daily basis, translating for her and learning how to assist her with basic tasks. In August, following Mot's discharge, Trinh quit his job to care for her full time. Weeks later, he declared bankruptcy.

Around 5:40 a.m. on the morning of September 14, Trinh called 911 and reported that Mot had stopped breathing and had blood coming from her mouth. Trinh received instructions on CPR and paramedics arrived shortly to find him attempting to revive his mother. The paramedics told Trinh his mother's condition was very serious and gave him an address and directions to Martin Luther Hospital, where they were transporting her by ambulance. The directions were correct but the address was wrong; when Trinh arrived at 8:00 a.m., Mot had already died of cardiac arrest. Trinh became very distraught. Asked if anyone needed to be called, Trinh replied that everyone was still in Vietnam.

The defense presented extensive expert testimony concerning Vietnamese family structure, Vietnamese distrust of Western medicine, the need for medically and culturally knowledgeable interpreters to explain procedures, the nature of caregiver burnout, depression among Vietnamese immigrating to the United States in the 1970's, and the grieving process.

4

### 3. *Charges and Guilt Phase Verdict*

Trinh was charged with three counts of first degree murder with special circumstances (multiple murder and lying in wait) and one count of attempted murder. (§§ 187, 189, 190.2, subd. (a)(3), (15), 664, subd. (a).) He was additionally charged with firearm use enhancements for each count. (§§ 12022.5, subd. (a), 12022.53, subds. (c), (d).) Before trial, the court dismissed the lying-in-wait special circumstance on the prosecution's motion.

A jury convicted Trinh on all first degree and attempted murder counts and found the multiple-murder special circumstance true. It also found the firearm use enhancements true.

### B. PENALTY PHASE TRIALS

Trinh's first jury was unable to reach a verdict on penalty, hanging 10 to 2 in favor of life. A second jury hung as well, 11 to 1 in favor of death.

### 1. *Prosecution Evidence at the Third Penalty Trial*

In the third penalty trial, the People relied on the circumstances of the crime and victim impact evidence.

Because the jury had not heard the guilt phase evidence, the prosecution presented anew testimony concerning the shootings. It supplemented that evidence by reading back Trinh's testimony from the second penalty phase trial. In that testimony, Trinh testified that he entered the hospital with a clear mind and a plan, executed three people, felt no remorse, would not apologize, and accepted the consequences. The people he killed, he killed because they looked familiar or got in his way. He originally made his plans when he checked his mother out of La Palma in July, but did not act then because he needed to continue to care for her. Once paramedics took his mother away on the morning of September 14, he knew she would die, so he retrieved his ammunition, loaded his guns, and drove to Martin Luther Hospital and then to West Anaheim. Had he not been stopped at

5

West Anaheim, he would have driven on to La Palma and killed people there, then committed suicide.  He wished to be sentenced to death because he had no reason left to live and wanted to join his mother in the next life.

The prosecution also introduced victim impact evidence from Mustaffa's husband, Rosetti's mother, siblings, and daughters, Robertson's wife and son, and Mila Salvador herself.

2. *Defense Evidence at the Third Penalty Trial*

The defense re-presented its guilt phase expert testimony concerning Vietnamese family structure, Vietnamese distrust of Western medicine, the need for medically and culturally knowledgeable interpreters to explain procedures, the nature of caregiver burnout, depression among Vietnamese immigrating to the United States in the 1970's, and the grieving process.

A witness who knew Trinh growing up testified that in Vietnam he had few friends and family aside from Mot.  Trinh and Mot were placed in a refugee camp in Guam in 1975 and immigrated to the United States from there.  Witnesses testified that after immigrating, Trinh had few if any friends and no family in the United States, spent all his spare time with his mother, and never married because his entire focus was on taking care of her.  Trinh was described as a reliable tenant and as an excellent employee at the various restaurants where he worked.

Trinh testified on his own behalf, as he had at each of the penalty phase trials.  In a statement to the jury, he declared he entered West Anaheim intending to execute people, had no excuses, regrets or remorse, would do it again if he could, and accepted full responsibility.  He tried to testify that American citizens had supported genocide in Vietnam and denounce the United States government and capitalism, though his statements were stricken; without objection, he explained he was doing his duty as a Vietnamese son, citizen and comrade by

6

executing Americans. As Trinh was leaving the stand, he told the jury to "Do your job, thank you."

Counsel contrasted this testimony with taped interviews of Trinh on the day of the shootings and during the first penalty phase trial. In the taped interviews, Trinh explained that when Mot was hospitalized, some nurses gave her poor care and laughed at her, so after Mot's release from La Palma, he formed a plan to kill those nurses at West Anaheim and La Palma. He waited to carry the plan out because he still needed to take care of Mot.

On September 14, Trinh loaded his guns and placed them and ammunition in his truck before driving to Martin Luther Hospital because he knew Mot was going to die. When he arrived at Martin Luther, he did not shoot anyone because he did not hold them responsible for his mother's condition. He stayed with his mother's body for about one hour. Upon leaving Martin Luther, he drove to West Anaheim; his mother had died, and those who had mistreated her would have to pay. Upon arriving, he walked into the hospital looking for staff he recognized who had mistreated or laughed at his mother. Seeing no one he recognized and not wanting to kill innocent people, he walked out and sat in his truck, then walked in a second time and, when he recognized Mustaffa and Salvador, shot at them. He retreated the way he had come, taking the stairs because he thought the elevators might be shut down. He shot Rosetti and Robertson only because they were preventing him from escaping; he wanted to leave and get to La Palma, carjacking someone if necessary because he believed his truck's description would be broadcast. As he was being subdued, Trinh said, referring to the second-floor staff, "Your guy[s] kill my mother."

Trinh expressed extreme regret for shooting Rosetti and Robertson and hoped they would survive. He asked for forgiveness if they died because he did

not intend to kill them.  Trinh did intend to kill Mustaffa, however, and expressed no regret at shooting at her or Salvador.

Trinh's first penalty phase testimony was also read.  Trinh said nothing he could say would bring anyone back.  He walked into West Anaheim with a plan, took three innocent lives, and accepted the consequences for his actions.  Trinh closed his narrative:  "To all of you folks, the famil[ies] who lost your loved one[s] because of me, I am willing to pay back everything I got, that is, my life.  Life for life, eyes for eyes.  I owe you my life because of their death.  And that is also my duty because I pay my debt to you. . . . I accept the death penalty.  And not because I say I am sorry to you, to those family who lost your loved ones because of me.  And I know . . . what I did hurt all your feeling[s].  And not only I insult you, but I hurt your family.  And to me, I bow my head before all of you and apologize.  And I am sorry for that."  On cross-examination during the first penalty phase, Trinh explained that he shot at Mustaffa and Salvador because he thought he recognized them, but realized too late he had misidentified them and they had nothing to do with him.  He walked out of West Anaheim the first time because he saw no familiar faces, but went in a second time because he had nothing left to go back to; he planned to kill himself afterward.  He did not want to kill every nurse, only those he blamed for mistreating his mother.  At the close of his first penalty phase testimony, Trinh addressed the jury, again apologized,  and told them to do the right thing and sentence him to death, as he deserved.

3.  *Third Penalty Trial Verdict*

After two hung juries, Trinh's third penalty phase jury returned a verdict of death.

8

## II.  DISCUSSION

### A.  PRETRIAL:  DENIAL OF MOTION TO RECUSE THE DISTRICT ATTORNEY'S OFFICE

The day after the Anaheim shootings, a man entered a church in Fort Worth, Texas, and shot 14 people, killing seven of them, before committing suicide.  These two incidents followed by less than five months the Columbine High School shootings, in which two students killed 13 people and injured roughly two dozen more before committing suicide.  (See Cullen, Columbine (2009) pp. 4–5, 349–353, 372.)  On September 16, 1999, two days after the Anaheim shootings and one day after the Fort Worth shootings, Orange County District Attorney Tony Rackauckas announced a new charging policy for public rampage killings.  Where formerly the decision whether to charge special circumstances had been made after review by a district attorney's office committee, including potentially input from defense counsel regarding mitigating circumstances, Rackauckas announced public rampage killings would automatically be charged as special circumstance cases.  Pursuant to this policy, Trinh was charged with special circumstances murder without a special circumstance committee convening.

Trinh moved to recuse the entire Orange County District Attorney's Office.  (§ 1424.)  Trinh argued that Rackauckas was personally invested in the case because his father had recently been hospitalized at, and had just a few days before been released from, the hospital where the shootings occurred, and the decision to single out Trinh for special and unfavorable treatment was a product of this conflict of interest.  The trial court denied the motion, finding that Trinh had shown neither an actual conflict nor any appearance of conflict that would render a fair trial unlikely.  Trinh sought writ relief; the Court of Appeal summarily denied his petition.  Trinh thereafter renewed his recusal motion before the second and

9

third penalty trials, but the renewed motions were likewise denied. Trinh argues these denials were an abuse of discretion, in violation of section 1424 and various federal and state constitutional guarantees. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.) We conclude it was not an abuse of discretion to permit the Orange County District Attorney's Office to charge and prosecute Trinh for capital murder.

Under section 1424, a motion to recuse a prosecutor "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (*Id.,* subd. (a)(1).) "The statute 'articulates a two-part test: "(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?" ' " (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.) The defendant "bear[s] the burden of demonstrating a genuine conflict; in the absence of any such conflict, a trial court should not interfere with the People's prerogative to select who is to represent them." (*Id.* at p. 709.) That burden is especially heavy where, as here, the defendant seeks to recuse not a single prosecutor but the entire office. (*People v. Gamache* (2010) 48 Cal.4th 347, 361; *People v. Hamilton* (1988) 46 Cal.3d 123, 139.) We review the trial court's decision for abuse of discretion. (*Gamache*, at p. 361; *Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 728–729.)

While Trinh asserts he has established numerous circumstances giving rise to a conflict of interest, our review of the briefs and record discloses only one alleged conflict: District Attorney Rackauckas's father was a former patient at West Anaheim, the hospital where the shootings occurred. This happenstance, Trinh argues, rendered Rackauckas emotionally invested in the case and was the true reason for his decision to depart from past practice in deciding this case should automatically be charged as a death case. Trinh's remaining allegations,

10

e.g., that Rackauckas failed to exercise discretion by adopting an automatic death policy, that he acted out of personal animus toward Trinh, and that he could be vindictive toward those in his office who disagreed with him on the implementation of the new policy, do not show any independent conflict but are instead supposed consequences flowing from Rackauckas's anger over the location of the shootings.

That Rackauckas's father was hospitalized at West Anaheim, but released before the shootings, is undisputed. The issue is whether this circumstance created " 'a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner' " and thus was the sort of conflict that would render it unlikely Trinh could receive a fair trial. (*Haraguchi v. Superior Court*, *supra*, 43 Cal.4th at p. 713.) The trial court concluded it was not.

Substantial evidence supports that determination. Rackauckas submitted a declaration denying any connection between his father's hospitalization and his treatment of Trinh: "My decision to exercise my prosecutorial discretion [by adopting a blanket policy for mass public killings] was entirely unaffected by the fact that I had visited my father at West Anaheim Medical Center a few days before the killings. My father was discharged from the hospital before the day of the shooting and, to my knowledge, neither of us knew any of the victims. The crime was no more upsetting to me than it would have been had my father never been a patient at the hospital." Instead, Rackauckas viewed it as his duty to deter the indiscriminate shooting of strangers in public places and adopted the automatic policy as a result. The trial court was entitled to credit Rackauckas's sworn

statements.[2]  At the time he adopted the new policy, Rackauckas was a first-year district attorney; it was eminently plausible that, in the wake of the mass killings at Columbine High School and other like incidents, he might have felt no loyalty to policies adopted by his predecessors and instead have chosen to treat the mass killing of strangers as an act uniquely suited to categorical special circumstances treatment by his office.  Nor, in the abstract, is the happenstance of a relative having some distant connection to a tragic event the sort of connection that might cast doubt on a prosecution's ability to act fairly and evenhandedly.  (Cf. *People v. Gamache*, *supra*, 48 Cal.4th at p. 362 [victim employed by district attorney's office created "paradigmatic conflict"]; *People v. Conner* (1983) 34 Cal.3d 141, 148 [that deputy district attorney was witness and potential victim created conflict]; *People v. Superior Court* (*Greer*) (1977) 19 Cal.3d 255, 269–270 [victim's mother employed by district attorney's office created conflict].)

In response, Trinh points to evidence he submitted that he claims renders it more likely Rackauckas truly was motivated to intercede by his father's hospitalization.  The record includes a declaration from a former assistant district attorney stating that Rackauckas was particularly upset by the killings at West Anaheim because his father had been hospitalized there; he expressed concern about what the media would do if it discovered his father had been a patient there; he hid the fact of his father's stay at West Anaheim for a year after charging Trinh, despite memos from attorneys in his office urging the relevancy of that information and the need to disclose it; he accused deputies of insubordination for disagreeing with his new policy of seeking capital punishment for all public

---

[2]    As we have noted before, "that the trial court's findings were based on declarations and other written evidence does not lessen the deference due those findings."  (*Haraguchi v. Superior Court*, *supra*, 43 Cal.4th at p. 711, fn. 3.)

rampage killings; and he reassigned and then terminated the assistant district attorney who had disagreed with his policy change and had urged him to disclose his father's hospitalization. In deciding whether the trial court abused its discretion, however, we are prohibited from reweighing the evidence; if credible evidence supports a trial court's findings, our review is at an end. (*People v. Alexander* (2010) 49 Cal.4th 846, 882–883; *People v. Hill* (1984) 37 Cal.3d 491, 499.)

When renewing his recusal motion before the second penalty phase trial, Trinh submitted a new grand jury report highly critical of various aspects of Rackauckas's conduct in office. None of the criticisms shed new light on Rackauckas's involvement in the prosecution of Trinh. The trial court expressly recognized as much, and its decision to again deny recusal was not an abuse of discretion. Before the third penalty trial, Trinh orally renewed his motion without submitting additional evidence; accordingly, the third denial must be upheld for the same reasons as the first two denials.

Section 1424's standards are "prophylactic" (*People v. Gamache*, *supra*, 48 Cal.4th at p. 366) and are designed "to prevent potential constitutional violations from occurring" (*People v. Vasquez* (2006) 39 Cal.4th 47, 59). It follows that because the trial court's denial of the recusal motion was not an abuse of discretion under section 1424, Trinh also suffered no violation of his constitutional rights. (*Gamache*, at p. 366.)

## B. GUILT PHASE ISSUES

### 1. *Refusal of Pinpoint Instruction on Provocation and Heat of Passion*

Trinh presented a heat of passion defense, claiming he acted upon provocation sufficient to reduce his culpability from first degree murder to second degree murder or manslaughter. (See *People v. Carasi* (2008) 44 Cal.4th 1263,

1306.)  The parties agreed the trial court would instruct the jury with the standard instruction on provocation and heat of passion.  The People requested an additional special instruction clarifying that any relevant provocation must come from, or reasonably be believed to come from, the victim.  (See *People v. Moye* (2009) 47 Cal.4th 537, 549–550.)  For his part, Trinh sought a pinpoint instruction emphasizing that the jury need not find a provocation sufficient to rouse a reasonable person to kill, but only a provocation sufficient to trigger actions out of passion rather than judgment.[3]  After extended discussion, the trial court denied Trinh's proposed instruction as argumentative, duplicative, and incorrect.  The court instructed the jury with CALJIC No. 8.42 and the People's special instruction instead.[4]  Trinh contends this was an abuse of discretion and violated

[3]     Trinh's proposed instruction read:  "By saying that a defendant is not permitted to set up his own standard of conduct, the court is not instructing you that the question to answer is whether or not a reasonable person would commit the act of killing another because of the provocation that the defendant believed he was under.  [¶] Rather the question is whether the provocation was such that a reasonable person would commit any act rashly and from passion rather than judgment because of it."

[4]     The jury was instructed with a slightly modified version of CALJIC No. 8.42:
        "To reduce an unlawful killing from murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion.
        "The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances.
        "A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable person faced with the same situation.

(*footnote continued on next page*)

14

his rights to due process and to have the court instruct the jury on his theory of the case. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15–17.)

As the People concede, Trinh's proposed instruction was not substantively incorrect. It accurately reflected the law relating to provocation and heat of passion. We recently reaffirmed that to reduce murder to manslaughter, provocation must be such as would "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment' " (*People v. Beltran* (2013) 56 Cal.4th 935, 957), while repudiating the argument urged by the prosecution in the trial court here that provocation must be such as would move an ordinary person to kill (*id.* at p. 938).

---

(*footnote continued from previous page*)

"Legally adequate provocation may occur in a short or over a considerable period of time, as a result of a single event or a series of events.

"No specific type of provocation is required, and the passion aroused may not be anger or rage, but can be any violent, intense, high wrought or [enthusiastic] emotion.

"The question to be answered is whether or not at the time of the killing the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection and from passion rather than from judgment.

"If there was provocation, whether of short or long duration, but of a nature not normally sufficient to arouse passion, or if sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to return, and if an unlawful killing of a human being followed the provocation and had all the elements of murder as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to manslaughter."

The court followed with the People's special instruction: "The provocation which incites the killer to act in the heat of passion must be caused by the decedent or reasonably believed by the accused to have been engaged in by the decedent. The provocation must be such as to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection."

15

Nor was the proposed instruction duplicative. Until our decision in *Beltran* "clarif[ied] what kind of provocation will suffice to constitute heat of passion and reduce a murder to manslaughter" (*People v. Beltran*, *supra*, 56 Cal.4th at p. 938), whether the provocation must be such as to cause an ordinary person of average disposition merely to act rashly or to kill was uncertain. The instructions read to the jury did not specifically address that point.

Finally, the proposed instruction was not argumentative. In its entirety, the instruction attempted only to clarify that Trinh need not prove provocation such as would cause a reasonable person to kill, but only provocation such as would cause a reasonable person to act rashly and from passion rather than judgment. It thus focused the jury on Trinh's theory of the case—that a defendant who was provoked to act rashly by preceding events could have his culpability mitigated—without impermissibly focusing the jury on any particular evidence or demanding favorable inferences from particular facts in the record. Consequently, Trinh was entitled to have the instruction given. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 720.)

However, the error was unquestionably harmless. As the People's special instruction appropriately highlighted, a heat of passion defense must arise from provocation supplied, or reasonably believed to have been supplied, by the victim or victims. (*People v. Moye*, *supra*, 47 Cal.4th at pp. 549–550.) There was no evidence Vincent Rosetti or Ronald Robertson had any role in Trinh's mother's care—they simply had the misfortune of coming between Trinh and escape. Even as to nurse Mila Salvador and nurse's aide Marlene Mustaffa, there was no evidence at the guilt phase they had any role, or were believed by Trinh to have had any role, in his mother's care. Consequently, there was no reasonable probability the giving of the requested pinpoint instruction would have led to a more favorable verdict.

16

## 2. *Failure to Provide the Jury with Written Copies of Two Instructions*

The trial court and parties agreed to instruct the jury with CALJIC Nos. 2.60 and 2.61, prohibiting the jurors from drawing any inferences from or attaching evidentiary significance to Trinh's election not to testify. The court thereafter read both instructions to the jury.[5] Inadvertently, however, the two instructions were not included in the packet of written instructions delivered to the jury room for reference during deliberations. Trinh contends this omission violated his privilege against self-incrimination, his right to due process, assorted other state and federal constitutional rights, and his state statutory rights. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 1, 7, 15–17; Pen. Code, § 1093, subd. (f).) We conclude no constitutional error occurred. Additionally, while the failure to provide the jury written copies of the two instructions was statutory error, it was harmless.

The Fifth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant, as part of the privilege against self-incrimination, the right to require that the trial court instruct the jury not to speculate or draw adverse inferences from the failure to testify. (*Carter v. Kentucky* (1981) 450 U.S. 288, 305; *People v. Leonard* (2007) 40 Cal.4th 1370, 1424–1425.) Contrary to Trinh's contention, however, no *Carter* error occurred here. Trinh sought the

---

[5] The jury was instructed: "A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact that a defendant does not testify. [¶] Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way. [¶] In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him. [¶] No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against him on any such essential element."

giving of CALJIC Nos. 2.60 and 2.61, as was his right, and the trial court agreed and delivered the requested instructions. The subsequent omission of these instructions from the written packet provided the jury does not vitiate the oral instructions. Neither the United States Supreme Court nor we have ever held that oral jury instructions are ineffectual unless augmented by written copies of the same instructions; to the contrary, we have established that neither the state nor the federal Constitution guarantees a criminal defendant the delivery of written instructions in addition to oral ones. (*People v. Seaton* (2001) 26 Cal.4th 598, 674; *People v. Ochoa* (2001) 26 Cal.4th 398, 447; *People v. Samayoa* (1997) 15 Cal.4th 795, 845 ["the provision of written instructions to the jury (although generally beneficial and to be encouraged) is not guaranteed by, and therefore does not implicate, any provision of the state or federal Constitution"].) The failure to provide written instructions is not tantamount to giving no instructions at all.

To controvert these holdings, Trinh relies on *People v. Osband* (1996) 13 Cal.4th 622, 686–688, which stands for the unexceptional proposition that correct written instructions may cure any oral misreading of the instructions. That the omission of written instructions nullifies orally read instructions accurately stating the law—as Trinh concedes the oral instructions did here—does not follow.

While the omission of a written instruction is not an error of constitutional dimension, the Legislature has seen fit to ensure as a statutory matter that defendants and juries have the benefit of written instructions upon request. (§ 1093, subd. (f); *People v. Ochoa*, *supra*, 26 Cal.4th at p. 447.)[6] The People and

---

[6] We also have indicated that provision of a full set of written instructions, whether requested or not, is the better practice, especially in capital cases. (*People v. Huggins* (2006) 38 Cal.4th 175, 190, fn. 3; *id.* at p. 260 (dis. opn. of Kennard,

(*footnote continued on next page*)

18

Trinh disagree over whether any formal request was made, but the record reflects counsel and the court intended the jury to receive a full set of instructions, and the omission of CALJIC Nos. 2.60 and 2.61 arose not because Trinh failed specifically to request their inclusion but because the trial court inadvertently omitted them when compiling the written jury instructions. However unintentional, this omission deprived Trinh of his statutory right to have a written copy of these two instructions delivered to the jury.

On this record, however, that error was harmless. The jury received the requested instructions orally. We presume they heard and followed them. (*People v. Pearson* (2013) 56 Cal.4th 393, 414; *People v. Whalen* (2013) 56 Cal.4th 1, 88; *People v. Homick* (2012) 55 Cal.4th 816, 867.) Trinh has pointed to nothing in the record—no evidence of confusion or indications this jury failed to understand or apply the instructions read to it—that would establish a reasonable probability of a more favorable outcome had the jury received written copies of CALJIC Nos. 2.60 and 2.61. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Seaton*, *supra*, 26 Cal.4th at p. 674; *People v. Cooley* (1993) 14 Cal.App.4th 1394, 1399–1400; *People v. Blakley* (1992) 6 Cal.App.4th 1019, 1023–1024.)

## C. PRE-PENALTY-TRIAL ISSUES

### 1. *Denial of Motion to Sentence Trinh to Life Without Possibility of Parole*

Trinh's first two penalty phase trials ended in mistrials with the jury deadlocked. Before a third penalty trial, Trinh moved to have the trial court impose a sentence of life without possibility of parole. (§ 190.4, subd. (b); see

---

(*footnote continued from previous page*)

J.); *People v. Seaton*, *supra*, 26 Cal.4th at pp. 673–674; *People v. Ochoa*, *supra*, 26 Cal.4th at p. 447; *People v. Samayoa*, *supra*, 15 Cal.4th at p. 845.)

*People v. Thompson* (1990) 50 Cal.3d 134, 177.) The trial court denied the motion. Trinh contends this was an abuse of discretion and thus a denial of due process and other constitutional guarantees. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 1, 7, 13, 15–17.) We disagree.

Under section 190.4, subdivision (b), following a hung jury, the trial court must conduct a retrial. (*People v. Thompson*, *supra*, 50 Cal.3d at pp. 176–177.) Following a second hung jury, however, "the court in its discretion shall either order a new jury or impose a punishment of confinement in state prison for a term of life without the possibility of parole." (§ 190.4, subd. (b).) Notably, the statute neither mandates that the trial court set out the reasons for its exercise of discretion nor compels the court to rely on any particular considerations in choosing between a life sentence and another retrial. The Legislature has thus chosen to vest considerable discretion in the trial judge, a judge who ordinarily will have had the benefit of presiding over the defendant's previous trials, as was the case here. Our examination of the trial court's ruling is correspondingly narrow. We review the trial court's legal conclusions de novo and its findings of fact for substantial evidence, but in the absence of either—as will typically be the case with a decision under section 190.4, subdivision (b)—we consider only whether the trial court's decision to proceed with retrial was arbitrary and capricious. (*Haraguchi v. Superior Court*, *supra*, 43 Cal.4th at pp. 711–712.)

Trinh's motion argued that a life sentence was the appropriate punishment based on the same factors a jury would consider, including Trinh's life history and demonstrated character and the role that extreme emotional grief played in the shootings. The motion also argued that Trinh had fabricated testimony in the second penalty trial to increase the chance of a death sentence and would do so again in a third trial. Finally, counsel stressed that the original jury hung 10 to 2 in favor of life and the second jury was divided only 8 to 4 in favor of death until,

20

allegedly, numerous jurors engaged in misconduct and swung the final division to 11 to 1.

The trial court confirmed the People desired a retrial. It then framed the central question before it as "whether or not 12 reasonable citizens will reach a unanimous verdict"—in other words, whether the evidence in the case was such that a verdict would ever be reached, or whether there was a significant risk retrial would yield only another hung jury. Against those probabilities the trial court weighed the cost to the families of the victims. Ultimately acknowledging that the matter required a "[v]ery hard decision," the trial court ordered a retrial.

Trinh finds two faults in the trial court's decisionmaking process. First, he contends the court failed to consider Trinh's mitigating evidence. However, the record reflects the trial court's consideration of all relevant factors, including the mitigating evidence. Trinh's counsel argued mitigation both in his papers and orally, and expressly acknowledged in the course of argument that the trial court had "read and considered our brief." The trial court's focus was on the likelihood of a future unanimous verdict. Its assessment of that likelihood was necessarily informed not only by the empirical results of the first two juries' votes, but also by the trial court's own sense of *all* the evidence it had heard, both mitigating and aggravating, in the course of presiding over one guilt phase and two penalty phase trials.

Second, Trinh argues that the second jury's ultimate 11-to-1 division in favor of death was the product of juror misconduct, and the trial court failed to account for that fact when weighing the jury's vote as evidence in favor of possible unanimity the next time around. However, the trial court was well aware of Trinh's allegations of misconduct; they were fleshed out at length in Trinh's moving papers and oral argument. Indeed, before ruling, the court expressly acknowledged the misconduct allegations were relevant to its decision. It simply

21

did not find them dispositive on the ultimate question before it, which was not whether a past juror or jurors had engaged in misconduct, but whether a future jury, properly instructed and warned against similar acts, might arrive at a unanimous verdict, and whether the likelihood of such a verdict was sufficient to justify further costs to the judicial system and to all involved. The trial court's determination that a unanimous verdict was sufficiently likely to warrant a third penalty trial was neither arbitrary nor capricious.

### 2. *Constitutionality of Allowing a Third Penalty Trial*

In addition to seeking a favorable exercise of discretion against retrial, Trinh argued to the trial court before both his second and third penalty phase trials that permitting a retrial would be unconstitutional. His motions were denied. Trinh renews his constitutional objections here, arguing that retrial violated his rights to due process and equal protection and the prohibition against cruel and unusual punishment. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 1, 7, 15–17.)

Trinh correctly notes that the Legislature's authorization of a penalty phase retrial, and especially its authorization of more than one penalty phase retrial, is rare. (See § 190.4, subd. (b); Ala. Code § 13A-5-46(g) (2013) [only other state statute authorizing more than one retrial].) Rarity of itself does not equate to unconstitutionality, however, and we have consistently rejected the claim that the rarity of California's retrial statute renders it inconsistent with "evolving standards of decency" (*Trop v. Dulles* (1958) 356 U.S. 86, 101) in violation of the Eighth Amendment to the federal Constitution (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 311; *People v. Taylor* (2010) 48 Cal.4th 574, 633–634; see *People v. McDowell* (2012) 54 Cal.4th 395, 411–416 [conducting second and third penalty trials, even after 15-year delay, does not violate 8th Amend. or due process]).

22

Trinh differs from previous defendants raising this challenge in that his penalty phase juries hung twice, and his death sentence verdict was issued by a third jury, but that distinction is not constitutionally significant. Trinh has not gone beyond the raw numbers to establish that other states' decisions not to authorize multiple penalty retrials reflect a moral consensus, as opposed to cost-benefit judgments about the value of continuing to allocate resources toward seeking the death penalty in a particular case. While the United States Supreme Court has made clear that the Eighth Amendment embodies collective moral judgments about the standards of decency in a civilized society (e.g., *Roper v. Simmons* (2005) 543 U.S. 551, 560–561; *Gregg v. Georgia* (1976) 428 U.S. 153, 172–173; *Trop*, at pp. 100–101), those collective judgments do not constrain state legislatures from arriving at differing conclusions concerning the societal benefits of seeking a death sentence at all (*Gregg*, at pp. 186–187) or, as here, the societal benefits of seeking a death sentence multiple times.

Trinh argues as well that even if not facially unconstitutional, the penalty phase retrial statute is unconstitutional as applied to him. He contends the trial court should have known a third penalty phase would not be "free of serious error," and that in fact his penalty retrial was not. However, as will appear, we reject Trinh's specific claims of penalty phase error (*post*, at pp. 32–39), and he identifies no errors beyond these that would render retrial unconstitutional. His as-applied challenge thus fails as well.

Lastly, Trinh argues that the provision authorizing a trial court to allow a second retrial or impose life without possibility of parole violates equal protection and due process because it contains no explicit standards governing the exercise of discretion. (See § 190.4, subd. (b).) Considering the role this provision plays in California's current death penalty scheme, we conclude the omission of standards

23

for deciding whether to forgo a third penalty trial does not violate the state or federal Constitutions.

Both Trinh and the People focus initially on *In re Anderson* (1968) 69 Cal.2d 613, 621–628, in which we considered equal protection and due process challenges to an earlier version of California's death penalty scheme and found them without merit, explaining that as with any number of other portions of the Penal Code granting trial judges unfettered discretion, a "statute mitigating capital punishment is not essentially unfair to the wrongdoer for failure to specify standards for the exercise of that discretion." (*Id.* at p. 625.) We agree with Trinh that *Anderson* cannot alone dispose of his challenge; the United States Supreme Court in the decade that followed that decision made clear that standardless selection between life and death is unconstitutional (*Furman v. Georgia* (1972) 408 U.S. 238; *Gregg v. Georgia, supra,* 428 U.S. at pp. 189–195), and the scheme *In re Anderson* upheld would not today pass constitutional muster.

It does not follow, however, that the retrial statute is unconstitutional for failing to articulate standards a trial court should apply. The statute comes into play only after a jury has determined a defendant is death eligible by finding true beyond a reasonable doubt one or more special circumstances, and before a jury has resolved whether death or life is the more appropriate penalty based on careful consideration of a wealth of aggravating and mitigating circumstances. (§§ 190.2, 190.3.) These twin safeguards—a careful narrowing of the eligible pool, followed by identification of those deserving death through the application of guided discretion—have consistently been held sufficient to render California's death penalty scheme constitutional, by both the United States Supreme Court and this court. (E.g., *Tuilaepa v. California* (1994) 512 U.S. 967, 971–980; *People v. Williams* (2013) 56 Cal.4th 165, 201.) Section 190.4, subdivision (b), implicates neither the initial eligibility question nor the ultimate question whether death must

24

be imposed. Instead, it affords some death-eligible defendants, those whose penalty phase trials have twice ended in hung juries or mistrials, the opportunity to have a trial judge remove them from the death-eligible pool. No constitutional provision guarantees any death-eligible defendant such a right; the Legislature could have, as it did for defendants whose juries had hung only once, made retrial a matter of course.

In this limited context, we conclude *In re Anderson*'s views on the permissibility of discretion in the criminal justice system in general, and capital punishment in particular, still have relevance and merit. Countless provisions in the Penal Code reflect institutional modesty on the part of the Legislature—a recognition that it, in the abstract, cannot set down with precision every factor that should determine what, in a given case, will amount to the dispensation of justice. (See §§ 17, 496 & 524; *In re Anderson*, *supra*, 69 Cal.2d at p. 626.) The Legislature rationally could conclude that a trial court would be better positioned to make a holistic decision whether a third penalty trial was warranted on a case-by-case basis, and that enactment of an abstract checklist would not advance the decisionmaking process. Trinh and others in his shoes are treated equally under the statute, and are better off than they would be if the Legislature had made retrial mandatory. Accordingly, we hold his retrial, as permitted by section 190.4, subdivision (b), violates neither equal protection nor due process.

    3.    Wheeler-Batson *Motion*

During jury selection for Trinh's third penalty trial, the prosecution exercised a peremptory challenge against a Vietnamese-American prospective juror, N.V. Trinh challenged this exercise of a peremptory as race based. The trial court ruled Trinh had made out a prima facie case of discrimination: N.V. "voir dired very well," gave answers "similar to those offered by other jurors," and

25

shared an ethnicity with Trinh. After hearing the prosecutor's reasons and affording Trinh an opportunity to argue, however, the trial court denied the motion. The jury as seated included no Vietnamese-Americans. Trinh renews his objection on appeal, arguing that he was deprived of the right to equal protection and trial by a representative jury. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 16.) We find no error.

### a. Legal Principles

Peremptory challenges may not be used to exclude prospective jurors based on race. (*Batson v. Kentucky* (1986) 476 U.S. 79, 97; *People v. Wheeler* (1978) 22 Cal.3d 258, 276; Code Civ. Proc., § 231.5.) "The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Blacksher* (2011) 52 Cal.4th 769, 801.)

" 'There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.' [Citation.]" (*People v. Dement* (2011) 53 Cal.4th 1, 19; see also *Purkett v. Elem* (1995) 514 U.S. 765, 768.) Under a now-familiar three-step process, to carry this burden a defendant must first "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved

26

purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)  The defendant's ultimate burden is to demonstrate that "it was more likely than not that the challenge was improperly motivated." (*Id.* at p. 170.) The same rules apply to state constitutional claims.  (*People v. Taylor* (2009) 47 Cal.4th 850, 886.)

Because the trial court found Trinh made a prima facie case of group bias and denied Trinh's motion only after evaluating the prosecution's stated reasons for exercising a peremptory challenge against Prospective Juror N.V., we proceed directly to the final stage of the *Batson/Wheeler* analysis and the ultimate question posed by Trinh's challenge: whether it is more likely than not that the prosecutor struck Prospective Juror N.V. because of his ethnicity.  The focus at this point " 'is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons.' [Citation.] ' "[E]ven a 'trivial' reason, if genuine and neutral, will suffice." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 917; see *Purkett v. Elem*, *supra*, 514 U.S. at p. 769.)

　　　　b.　Juror N.V.

The prosecutor explained his decision to strike N.V. as based on three considerations.  First, N.V. had reached middle age without ever marrying or having children.  Second, he was a postal worker.  Third, N.V.'s questionnaire revealed no opinions on the death penalty, and in voir dire the prosecutor was unable to get him to elaborate.

Challenging these reasons as pretextual, Trinh asks us to conduct a comparative analysis with seated jurors Trinh contends shared these characteristics.  (See *People v. Lenix* (2008) 44 Cal.4th 602, 622.)  We have explained:  " '[T]he trial court's finding is reviewed on the record as it stands at the time the [*Batson/Wheeler*] ruling is made.' (*Lenix*, *supra*, 44 Cal.4th at

27

p. 624.)  'If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments.'  (*Ibid.*)"  (*People v. Chism* (May __, 2014, S101984) __ Cal.4th ___, ___ [p. 59].)  Eight of the 12 jurors (Nos. 1–5, 8, 10 & 11) and all four alternates were voir dired and seated after the *Batson/Wheeler* motion was denied.  If Trinh believed the postruling responses of these jurors were relevant, he should have renewed that motion to avoid forfeiture.  (*Chism*, at p. ___ [p. 59].)

Nevertheless, as in *People v. Chism*, *supra*, __ Cal.4th ___, we have examined the entire record, including conducting a comparative analysis with all seated jurors.  We have also looked at other prospective jurors the prosecution chose to strike.  (See *Snyder v. Louisiana* (2008) 552 U.S. 472, 478 [court may consider other strikes in evaluating whether racial animus underlay a particular strike].)  We conclude the record supports the prosecutor's assertion that his proffered considerations distinguish N.V.  It was, accordingly, not erroneous for the trial court to conclude the prosecutor's stated reasons were bona fide and that Trinh had not carried his burden of showing ethnicity was the real reason for N.V.'s elimination from the jury.

*The combination of age, marital status and parental status.*  The prosecutor did not suggest that N.V.'s age or unmarried, childless status alone disqualified him, but that the combination was an issue:  a juror who was 45 and single and had never been married or had children was "not the type of juror I would keep."  (See *People v. Gray* (2005) 37 Cal.4th 168, 189 ["a party may decide to excuse a prospective juror for a variety of reasons, finding no single characteristic dispositive"].)  Indeed, these demographics distinguished N.V. from every other member of the jury.  Among the 16 jurors and alternates, 15 had married, 10 were married with children, and the lone unmarried and childless juror was much

28

younger—22—and had had correspondingly less time to decide whether to have a family. The explanation is also consistent with the prosecutor's use of other strikes: the prosecutor used peremptories to remove two other middle-aged, unmarried, and childless prospective jurors.

*Occupation*. The prosecutor also explained that N.V.'s occupation as a postal worker made him "not the type of juror I would keep." The trial court expressed doubt about the wisdom of using occupations to exclude jurors but indicated that in its experience both this prosecutor and others in fact did so—that is, that the proffered explanation was bona fide, not a pretext. This was the issue for the trial court, and for us—the genuineness of the proffered basis, not its validity as a means of identifying preferable jurors. (*People v. Jones*, *supra*, 57 Cal.4th at p. 917; *Purkett v. Elem*, *supra*, 514 U.S. at p. 769.) Whether a prosecutor's generalizations about a given occupation have any basis in reality or not, a prosecutor "surely . . . can challenge a potential juror whose occupation, in the prosecutor's subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected." (*People v. Reynoso* (2003) 31 Cal.4th 903, 925.)

No other seated jurors had connections to the postal service. Trinh correctly notes that one of the alternates, Alternate Juror No. 4, was also a postal employee. However, in examining the four alternate jurors, the prosecutor took a markedly different approach than when selecting the first 12 jurors, engaging them in a much more cursory voir dire and failing to exercise any strikes, in contrast to using 17 peremptories in the selection of the main jury. As well, the other factors expressly relied upon by the prosecutor distinguished N.V. from Alternate Juror No. 4. Unlike N.V., Alternate Juror No. 4 was married with two children. Also unlike N.V., Alternate Juror No. 4 expressly "support[ed] the death penalty in

29

cases where it is appropriate" and felt the "appeals process is too long" and that "[j]ustice delayed is justice denied."

*Death penalty views.*  As a third basis for excusing N.V., the prosecutor explained that N.V.'s questionnaire revealed no opinion about the death penalty, and he was unable in subsequent voir dire to extract any further opinion.  The record supports this explanation.  Asked his general feelings about the death penalty, N.V. wrote, "None."  Asked more specifically whether the death penalty was used too often, too seldom, or randomly, N.V. wrote, "I don't have any opinion, I don't really pay attention [to] the death penalty."  To every other one of the dozen or so questions that called for an opinion about the death penalty, N.V. answered summarily "yes" or "no."

In voir dire, the prosecutor noted N.V.'s stated lack of an opinion about the death penalty and that N.V. had not really thought about it, and asked if N.V. had "been able to think about [his views on the death penalty] since last week?"  N.V. replied, "No, sir."  The prosecutor again asked if N.V. had any feelings about the death penalty.  N.V. replied, "No, I mean I don't have any strong opinion to give the death penalty or life in prison without parole, neither is more severe than the other."  Asked then to confirm that he saw death and life without parole as "the same," N.V. said, "I did not think about it."  Asked whether he had ever discussed the death penalty with others, N.V. replied, "No, sir."  The trial court agreed that N.V. "was really just quick to give a yes or no answer to satisfy the question," rather than offering a more detailed explication of his views.  He found true the prosecutor's perception that N.V. was unwilling to offer an opinion about the death penalty:  "And you questioned him quite a bit, he had no opinions about the death penalty."  A prospective juror's unresponsiveness concerning opinions about the death penalty is a valid nondiscriminatory basis for striking a juror.  (*People v. Mills* (2010) 48 Cal.4th 158, 176–180.)

30

Trinh points to five other jurors and one alternate he contends were equally reticent about their death penalty views, but the record does not support his claim. Unlike N.V., none of the five seated jurors responded exclusively with one-word answers, and each at one point or another provided far more insight into their actual thinking. Juror No. 1 confirmed that in "the appropriate circumstances [the death penalty] has its place" and later, in denying any conscientious objection, affirmed that the death penalty "has merit in the right circumstances." She also identified crimes for which she thought death should be automatic. Juror No. 2 indicated that "[i]n some cases, the death penalty is absolutely warranted" and listed examples. Juror No. 3 offered questionnaire answers indicating she had thought about the death penalty and described the types of crimes she thought deserved automatic death. In voir dire, she explained that she thought of the death penalty as a "harsher" punishment than life without parole and would treat it as such in deliberations. Juror No. 8 expressly "support[ed] the death penalty in heinous crime cases" and indicated death was appropriate for mass murderers. While the death penalty was imposed too frequently in some places, such as Texas, it was not imposed too frequently in California. Finally, Juror No. 12 indicated her belief that the death penalty should "exist as an option to be imposed when a jury feels it is appropriate" and added a lengthy paragraph detailing her thoughts about the frequency with which death was imposed and the imperfect correlation between cases where it was imposed and cases where it should be imposed. In voir dire, she offered that she had "always believed in the death penalty all [her] life."

Trinh is correct that Alternate Juror No. 1's responses concerning the death penalty were nearly as sparse as those of N.V., but unlike N.V., the alternate did offer her affirmative belief that death should be "an option" for some cases. Moreover, as indicated, the prosecutor invested much less energy in vetting the

31

alternates. Alternate Juror No. 1 was the last juror chosen; Trinh's counsel joked at the start of the very brief voir dire both sides conducted, "Do you [Alternate Juror No. 1] have any idea how many people are going to buy you lunch if we just accept you?" That the prosecutor accepted Alternate Juror No. 1, a married mother of two, does not cast doubt on the nondiscriminatory reasons he gave for choosing to strike N.V.

In the trial court, Trinh offered only the bare fact of N.V.'s ethnicity to rebut the genuineness of the prosecutor's proffered nondiscriminatory reasons.[7] The comparisons to other jurors he presents on appeal do not establish the trial court erred in accepting as genuine those proffered reasons. "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*Purkett v. Elem*, *supra*, 514 U.S. at p. 768.) We conclude Trinh has not carried that burden.

### D. PENALTY TRIAL ISSUES

#### 1. *Admissibility of the Prosecution's Victim Impact Evidence*

Before the third penalty trial, Trinh moved to limit both the scope of the People's victim impact evidence and the number of witnesses per victim. The trial court granted Trinh's motion in part, precluding the prosecution from asking certain forms of questions it concluded, based on the second penalty trial, were too likely to elicit irrelevant or inflammatory responses, but otherwise denied the motion. Thereafter, over the course of part of one morning, the People presented

---

[7] After the prosecutor spelled out his reasons, defense counsel replied, "Well, I just think that is insufficient. Your Honor, I will submit on that." After the trial court indicated its preliminary view that the prosecutor had rebutted any inference of discrimination, the court gave Trinh a second chance to highlight reasons to think N.V.'s removal from the jury was based on race. Trinh declined the opportunity and again simply submitted the matter.

the testimony of nine victim impact witnesses, a reduction from the 11 who testified at the second penalty trial. Trinh contends the ensuing victim impact testimony included inflammatory, irrelevant, and prejudicial matters, in violation of his due process and other rights. (U.S. Const., 5th, 8th & 14th Amends.; Cal. Const., art. I, §§ 15, 17.) Having reviewed the testimony, we conclude no error occurred.

The admission of victim impact evidence in a capital trial does not violate the Eighth Amendment per se (*Payne v. Tennessee* (1991) 501 U.S. 808, 827; *People v. Tully* (2012) 54 Cal.4th 952, 1030) and, insofar as it demonstrates "the specific harm caused by the defendant, including the impact on the family of the victim," is admissible under section 190.3, factor (a) (*People v. Edwards* (1991) 54 Cal.3d 787, 835; see *Tully*, at p. 1031; *People v. Virgil* (2011) 51 Cal.4th 1210, 1274–1275). There are limits: victim impact evidence is inadmissible under state law to the extent it "invites a purely irrational response," and is precluded under the federal Constitution "if it is so unduly prejudicial as to render the trial fundamentally unfair." (*People v. Booker* (2011) 51 Cal.4th 141, 190; accord, *People v. Linton* (2013) 56 Cal.4th 1146, 1203.) We review the trial court's admission of victim impact evidence for abuse of discretion. (*People v. Vines* (2011) 51 Cal.4th 830, 887–888; *People v. Murtishaw* (2011) 51 Cal.4th 574, 595–596.)

First, Trinh argues the trial court abused its discretion by failing to limit the number of witnesses testifying in connection with each victim.[8] In the trial court,

---

[8] Attempted murder victim Mila Salvador testified on her own behalf. Murder victim Marlene Mustaffa's husband testified. Murder victim Vincent Rosetti's mother, brother, sister, and two daughters testified. Finally, murder victim Ronald Robertson's wife and son testified.

Trinh sought a limit of two witnesses per victim; here, he argues that no more than one should have been allowed. We decline to impose such an arbitrary bar. (*People v. Montes* (2014) 58 Cal.4th 809, 883–884 [victim impact testimony need not be limited to a single witness]; *People v. McKinnon* (2011) 52 Cal.4th 610, 690 [same]; see, e.g., *People v. Pearson*, *supra*, 56 Cal.4th at p. 467 [concluding "[t]he overall number of victim impact witnesses was not excessive" where eight testified concerning one murder victim and five testified concerning another].) The number of witnesses sufficient to accurately portray the effects of a defendant's actions will vary from case to case, and the trial court is vested with discretion to control any excesses by excluding cumulative as well as irrelevant testimony. (Evid. Code, §§ 350, 352.) Nor do we agree with Trinh's contention that even apart from the number of witnesses, the witnesses' testimony here was unduly cumulative. If they choose, "[t]he People are entitled to present a ' "complete life histor[y] [of the murder victim] from early childhood to death" ' " (*People v. Garcia* (2011) 52 Cal.4th 706, 751), subject to the trial court's exercise of discretion under Evidence Code section 352. It is inevitable the description of the victim by multiple witnesses will overlap to some extent. That such overlap occurred with the testimony by the families of Vincent Rosetti and Ronald Robertson did not render the trial fundamentally unfair or invite the jury to decide based on an irrational response.

Second, Trinh argues the testimony actually given should have been restricted to discussions of the effect of the crimes on the victims' immediate family and those present at the crime scene, not the victims' friends or the community at large. Neither the United States Supreme Court nor this court has ever identified a constitutional or statutory basis for so constraining the permissible scope of victim impact testimony (see *Payne v. Tennessee*, *supra*, 501 U.S. at pp. 822–823 [prosecution may be permitted to show the loss to the

34

community as a whole]; *id.* at p. 830 (conc. opn. of O'Connor, J.) [same]; *People v. Pearson*, *supra*, 56 Cal.4th at pp. 466–467; *People v. Thomas* (2011) 51 Cal.4th 449, 507–508; *People v. Ervine* (2009) 47 Cal.4th 745, 792–793), and because Trinh offers no persuasive reasons that would render these authorities inapposite, we again decline to do so here.

Third, Trinh contends victim impact testimony should have been confined to effects that were known or reasonably should have been known by Trinh at the time of the crimes or were part of the proof of the underlying charges. We have repeatedly rejected this limit as neither constitutionally nor statutorily warranted. (*People v. Tully*, *supra*, 54 Cal.4th at p. 1031; *People v. Thomas* (2012) 54 Cal.4th 908, 941; *People v. Myles* (2012) 53 Cal.4th 1181, 1219; *People v. McKinnon*, *supra*, 52 Cal.4th at p. 690.) Trinh offers no cogent arguments for reconsidering these cases, and we reject the proposed limit again.

Finally, Trinh objects that allowing victim impact testimony exposed the jury to an outburst by one of the witnesses, Suzanne Robertson, in response to a defense counsel objection,[9] as well as Robertson's attempt at the close of her testimony to directly address Trinh in a foreign language, perhaps Vietnamese. The trial court sustained the objection that provoked the witness's original outburst and later struck from the record her attempt to address Trinh directly and admonished the jury to disregard it. Only one juror heard Robertson's remarks— but did not understand them—and in any event, we presume the jurors followed the court's admonishment to disregard them (*People v. Pearson*, *supra*, 56 Cal.4th

---

[9]     During Robertson's testimony, defense counsel objected to the form of a question posed to her. Before the trial court could sustain the objection, Robertson told Trinh's counsel: "This is a never-ending story. [¶] I am real tired of your objections."

35

at pp. 434–435; *People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 292). There was no prejudice from either incident.

### 2. *Prosecutorial Misconduct*

As part of his motion before the third penalty trial to limit the scope of victim impact evidence, Trinh identified particular questions he thought were unduly likely to prompt irrelevant or inflammatory responses. The trial court agreed, noting that questions such as " 'How did you learn of the murder?,' " " 'What happened at the funeral?,' " " 'What was the hardest thing to do after you found out he was murdered?,' " and " 'Anything else you need to tell us?' " had consistently yielded irrelevant or improper responses during the second penalty trial, and defense objections to these questions would be sustained.

When it came time to introduce victim impact evidence, the prosecutor disregarded the foregoing admonition and proceeded in short order to ask each of the first five witnesses, and six of the first seven, versions of one or more of the foreclosed questions. Each time, Trinh's counsel objected. Each time, the objection was sustained.[10] The last time finally resulted in the aforementioned

---

[10] Direct examination of Dave Mustaffa:
"Q.: Where were you when you learned she had been killed?
"A.: I was at work, and they called me on the radio and told me to come up to the office, that they needed to talk to me. And when I got up—
"[Defense Counsel]: Your Honor, I would respectfully object.
"A.: —They took me into the back.
"The Court: The objection is sustained.
"Q.: After you learned that your wife was killed, what was the hardest thing for you to do initially?
"[Defense Counsel]: I would object, Your Honor. I am sorry. But I think that is an improper form.
"The Court: Rephrase your last question.
"Q.: Tell us how your wife's death has impacted you."

(*footnote continued on next page*)

(*footnote continued from previous page*)

Direct examination of Debbie Marshall:

"Q.: After you learned of Vince's death, what was the hardest thing for you?

"[Defense Counsel]: Objection, Your Honor, improper form.

"The Court: Sustained.

"Q.: What was the impact of his death on you?"

Direct examination of Michael Rosetti:

"Q.: After you learned of his death, what was the hardest thing for you?

"[Defense Counsel]: Objection, Your Honor, improper form.

"The Court: Sustained.

"Q.: Tell us how your brother's death impacted you.  [¶] . . . [¶]

"Q.: Is there anything else that you need to tell us?

"[Defense Counsel]: Objection, improper form.

"The Court: Sustained.

"Q.: Thank you very much, Sir."

Direct examination of Angela Rosetti-Smith:

"Q.: Initially what was the hardest thing for you after your dad was killed?

"[Defense Counsel]: Objection, Your Honor, improper form.

"The Court: Sustained.

"Q.: Tell us how your dad's murder impacted you."

Direct examination of Becky Rosetti:

"Q.: Initially after your dad was killed, what was the hardest thing for you—

"[Defense Counsel]: Objection, Your Honor, improper form.

"The Court: Sustained.

"Q.: Tell us about the impact of your dad's murder on yourself."

Direct examination of Suzanne Robertson:

"Q.: What is the hardest thing for you now?

"A.: I think that—

"[Defense Counsel]: Objection—

"The Witness: This is a never-ending story.  [¶] I am real tired of your objections.

"Q.: Ma'am—

"The Court: Sustained.

"Q.: Suzanne, tell us how this has impacted your family."

outburst from witness Suzanne Robertson. (See *ante*, at p. 35 & fn. 9, pp. 36–37, fn. 10.) Trinh contends the prosecutor's actions deprived him of due process. (U.S. Const., 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.)

We agree with Trinh that it was misconduct for the prosecutor repeatedly to ask questions in a form the court had prophylactically barred the prosecution from using because of the risk of yielding improper responses, and to which the court thereafter time and again sustained objections. " 'It is, of course, misconduct for a prosecutor to "intentionally elicit inadmissible testimony." [Citations.]' [Citation.] Such misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected." (*People v. Smithey* (1999) 20 Cal.4th 936, 960; accord, *People v. Tully*, *supra*, 54 Cal.4th at p. 1035; *People v. Abel* (2012) 53 Cal.4th 891, 925.) At the outset, and certainly before the fifth time, it should have been apparent to the prosecutor that asking a witness what, in the wake of a loved one's murder, was the hardest thing for him or her was a form of question the trial court would not permit. (Cf. *Tully*, at p. 1037 [holding it would be misconduct for the prosecutor to repeatedly violate a standing court order as to the form of questions directed to victim impact witnesses, but finding no misconduct in the absence of such an order].) As Trinh notes, by repeatedly pursuing this line of questioning, the prosecution offered defense counsel the Hobson's choice of alienating witnesses and losing the sympathies of the jury by interrupting emotionally fraught testimony or forgoing objection to questions the trial court had already established were likely to yield irrelevant or inflammatory responses.

However, Trinh has not shown the misconduct resulted in prejudice. Generally, there is no prejudice where an objection is made and sustained. (*People v. Pearson*, *supra*, 56 Cal.4th at p. 427; *People v. Tully*, *supra*, 54 Cal.4th at p. 1038; *People v. Fuiava* (2012) 53 Cal.4th 622, 687; *People v. Dykes* (2009)

38

46 Cal.4th 731, 764.) Because the trial court sustained each objection, no inadmissible testimony was heard by the jury. Nor do we agree with Trinh's contention that the posing of these questions alone implied to the jury that the prosecutor possessed additional information about unspecified, undisclosed devastating impacts from Trinh's acts. Although the repeated asking of these questions was clear misconduct, the consequences of the improper questions fell far short of "infect[ing] the trial with such unfairness as to render the subsequent conviction a denial of due process" (*People v. Avila* (2009) 46 Cal.4th 680, 711), and there is no reasonable probability they influenced the verdict (see *People v. Turner* (2004) 34 Cal.4th 406, 433).

### E.  POSTTRIAL ISSUES

#### 1.  *Denial of Motion for New Trial*

Before sentencing, Trinh moved for a new trial on various grounds. (See § 1181.) The trial court denied the motion. On appeal, Trinh renews his argument with respect to three of these grounds. We review for an abuse of discretion (*People v. Homick*, *supra*, 55 Cal.4th at p. 894) and conclude the trial court did not err.

Two of the three bases for a new trial we have already addressed. Trinh contends a new trial was required because of intentional prosecutorial misconduct, but the misconduct was not prejudicial. (*Ante*, at pp. 36–39.) Trinh also argues that a new trial was required because subjecting him to a third penalty trial was unconstitutional. Section 190.4, subdivision (b), authorizing third penalty trials, is constitutional both on its face and as applied to Trinh. (*Ante*, at pp. 22–25.) Moreover, any problems with permitting a third penalty trial to go forward would not have been cured by subjecting Trinh to a fourth penalty trial, the only relief available. (§ 1181.)

Trinh's remaining new trial claim rests on an incident of spectator misconduct. As has been mentioned, during direct examination, victim impact witness Suzanne Robertson, the widow of Ronald Robertson, responded directly to a defense counsel objection: "This is a never-ending story. [¶] I am real tired of your objections." According to a defense investigator's declaration, Derek Robertson, Ronald and Suzanne's son, also called out from the audience, " '[S]hut up, bitch.' " In the investigator's opinion, the remark was directed at the male cocounsel for Trinh who interposed the objection.

"[I]n general, a party promptly should object to audible comments from spectators that have the potential to prejudice the jury, thereby enabling the trial court to correct the problem at the outset." (*People v. Cornwell* (2005) 37 Cal.4th 50, 87, fn. 8.) The " 'failure to object to and request a curative admonition for alleged spectator misconduct waives the issue for appeal if the objection and admonition would have cured the misconduct.' " (*People v. Chatman* (2006) 38 Cal.4th 344, 368.) As the trial court noted in denying Trinh's new trial motion, Trinh did not object to Derek Robertson's comment. Trinh responds that when the trial court observed angry facial expressions from Derek during Suzanne Robertson's testimony and thereafter expressed concerns that if called as a witness Derek would prove uncontrollable, Trinh's attorneys indicated they had heard a remark from Derek, but this observation constitutes neither an objection nor a request for redress. Trinh's counsel did not specify at the time what they had heard Derek say, nor did they seek any remedial action from the trial court. Neither the trial court nor the prosecutor heard the remark; the trial court thus had no opportunity to admonish the jury and ameliorate any prejudice.[11]

---

**11**     Counsel could rationally have concluded that pursuing the matter further with the jury would only serve to highlight and give weight to a heckle that many,

(*footnote continued on next page*)

Trinh contends the trial court should in any event have investigated sua sponte whether the jury had heard Derek Robertson's comment once the court learned of it. However, the court reasonably could have decided the single three-word remark was so de minimis that even if the jury had heard it, there simply was no possibility it would affect the verdict and prejudice Trinh. (*People v. Myles*, *supra*, 53 Cal.4th at p. 1215 [spectator misconduct will not warrant a mistrial unless it could influence the verdict]; *People v. Cornwell*, *supra*, 37 Cal.4th at p. 87 [trivial and innocuous spectator comments are an insufficient basis for a new trial].) This is so even if we consider the remark in combination with Suzanne Robertson's comment from the witness stand (see *ante*, at p. 35 & fn. 9, p. 37, fn. 10), as Trinh asks us to. Taking into account the entirety of the evidence admitted at the penalty phase, the trial court did not abuse its discretion in determining the incident was inconsequential and denying the motion for a new trial. (See *Cornwell*, at p. 87 ["the trial court must be accorded broad discretion in evaluating the effect of claimed spectator misconduct" because it typically is present and "in the best position to evaluate the impact of such conduct on the fairness of the trial"].)[12]

---

(*footnote continued from previous page*)

most, or all jurors might not have even heard. (See *People v. Hinton* (2006) 37 Cal.4th 839, 898–899.)

[12]    For additional support, Trinh cites the same constellation of out-of-state spectator misconduct cases we considered and distinguished in *People v. Lucero* (1988) 44 Cal.3d 1006, 1023–1024 and *People v. Myles*, *supra*, 53 Cal.4th at page 1216. They are no more persuasive here; like *Lucero*, this case involves a "single isolated outburst" (*Lucero*, at p. 1023), not the repeated misconduct sometimes found sufficient to warrant reversal by various sister state courts.

2. *Denial of Postverdict Motion for Life Without Possibility of Parole Sentence*

Following the third penalty phase trial and before sentencing, Trinh moved on constitutional grounds to have the trial court set aside the death verdict and impose a sentence of life without parole. Counsel argued that over the course of three trials, Trinh had learned how best to tailor his testimony to ensure the jury would return his desired verdict, death, and accordingly the verdict was a product of Trinh's fabrications and an unreliable and unfair trial. The People opposed the motion as baseless, and the trial court summarily denied it. Trinh argues this was error, in violation of his rights to due process and a fair and reliable trial. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 1, 7, 13, 15–17, 22.)

A defendant has the fundamental right to testify, even over the objections of counsel. (*Rock v. Arkansas* (1987) 483 U.S. 44, 49–53; *People v. Nakahara* (2003) 30 Cal.4th 705, 717.) A defendant may exercise that right to plead with a jury for a death sentence. (*Nakahara*, at p. 719; *People v. Bradford* (1997) 15 Cal.4th 1229, 1364; *People v. Clark* (1990) 50 Cal.3d 583, 617.) Doing so does not render the penalty trial unconstitutionally unreliable, particularly where the jury is given a limiting instruction reminding it that the responsibility for deciding the appropriate penalty remains the jurors' and should be based solely on their evaluation of the relevant aggravating and mitigating evidence. (*Nakahara*, at p. 719; *People v. Webb* (1993) 6 Cal.4th 494, 534–535; *People v. Guzman* (1988) 45 Cal.3d 915, 961–963.)

These principles apply fully here. Granting Trinh's counsel's contention that Trinh's testimony at the third penalty trial was calculated to persuade the jury to vote for death, we note that the jury was expressly instructed not to abdicate its

responsibilities and simply accede to Trinh's wishes.[13]  We assume the jury

followed this instruction (*People v. Pearson*, *supra*, 56 Cal.4th at p. 414; *People v.

Whalen*, *supra*, 56 Cal.4th at p. 88; *People v. Homick*, *supra*, 55 Cal.4th at p. 867)

and independently evaluated the aggravating and mitigating evidence.

Trinh argues the trial court erred by failing to address the merits of his

motion, but the court was not obligated to explain in any detail the reasons for its

ruling, which was manifestly correct under settled precedent that bound it.  The

court afforded counsel an opportunity to argue the motion; when counsel declined

and submitted on the papers, the court's summary denial was sufficient to dispose

of the motion (see *In re Podesto* (1976) 15 Cal.3d 921, 937 [recognizing that the

requirement of a statement of reasons from a trial court is the exception rather than

the rule]; cf. *People v. Kelly* (2006) 40 Cal.4th 106, 112–117 [discussing the

contrasting constitutional requirement that appellate courts state their reasons

when disposing of a cause]).

Trinh also argues that *People v. Webb*, *supra*, 6 Cal.4th 494, and *People v.

Guzman*, *supra*, 45 Cal.3d 915, are distinguishable because Trinh's testimony was

more inflammatory than in those cases and tantamount to a waiver of his right to a

fair trial, and because the trial court was on notice from the previous penalty trials

that Trinh would seek to inject irrelevant and untrue statements into his testimony

and should have barred retrial to stop him.  We find no basis for a distinction.

True, Trinh implicitly asked the jury for a death sentence, saying that he

"execute[d] three of your fellow U.S. citizen[s]" and "accept[ed]" the same in

---

**13**    The trial court read a modified version of CALJIC No. 8.85 to the jury,
advising the jurors in part:  "Despite the testimony of Mr. Trinh, the defendant in
this case, it remains your obligation to decide for yourself, based on the statutory
factors that I have read to you, whether death is appropriate."

return and telling the jury to "[D]o your job." But this is little different from the testimony in *Webb* and *Guzman*, in which the defendants went so far as to explicitly ask for death. (*Webb*, at p. 513; *Guzman*, at pp. 929–933.) Trinh's counsel presented a full case in mitigation. Trinh's testimony did not amount to a waiver of a fair trial and deprive the state of its interest in a reliable penalty determination. (See *Guzman*, at p. 962.) Moreover, the trial court, alerted to Trinh's possible intentions, exercised control over Trinh's testimony, barring him from testifying about newly invented political motivations for the killings and repeatedly striking Trinh's answers when Trinh tried to disregard questions and extemporize to the jury.[14] Contrary to Trinh's assertions, the third penalty trial was not infused with irrelevancies and falsehoods.

Consequently, we adhere to our prior rulings in *People v. Webb*, *supra*, 6 Cal.4th 494, and *People v. Guzman*, *supra*, 45 Cal.3d 915, that a defendant's request for death does not irremediably undermine the reliability of the penalty phase trial. Indeed, to conclude otherwise would create a perverse "Catch-22" in which a defendant, by testifying in an inflammatory fashion in a way superficially intended to ensure a death sentence, could thereby become entitled to a life

---

[14]     In the wake of the shootings and at the first penalty trial, Trinh made clear his sole motivation was to avenge perceived hospital mistreatment of his mother and expressed remorse. At the second penalty trial, Trinh denied remorse and tried for the first time to claim he was killing Americans as revenge for United States actions in Vietnam. Before the third penalty trial, the court made clear it would exclude any attempt by Trinh to inject United States–Vietnam issues into the trial as irrelevant and, even if marginally relevant, as more prejudicial than probative because of the high military presence and pro-military sentiment in Orange County. As the court put it: "Trinh doesn't want a fair trial. I am going to do my best to give him one. That's all I can do. I think that's what this government is all about."

44

sentence. The trial court did not err in refusing Trinh's request to substitute a sentence of life without possibility of parole in place of the jury's death verdict.

### 3. *Cumulative Prejudice from Errors*

Trinh contends that even if we do not conclude any individual error during the pretrial, guilt, or penalty phases mandates reversal, the cumulative effect of the alleged errors denied him due process and compels reversal. We disagree. The refusal of a heat of passion pinpoint instruction, the failure to provide the jury with copies of CALJIC Nos. 2.60 and 2.61, and the prosecutor's repetition of improper questions did not prejudice Trinh when considered in combination any more than they did when considered individually. Consistent with our review of defendant's individual claims, we find no cumulative error occurred.

### 4. *Constitutionality of California's Death Penalty*

Finally, Trinh raises a series of challenges to the constitutionality of California's death penalty. We have rejected each before, and because Trinh offers no compelling arguments in favor of reconsidering these rulings, we do so again.

California's special circumstances (see § 190.2) adequately narrow the class of murderers eligible for the death penalty. (*People v. Williams*, *supra*, 56 Cal.4th at p. 201; *People v. Homick*, *supra*, 55 Cal.4th at p. 903; *People v. Tully*, *supra*, 54 Cal.4th at p. 1067; *People v. Lightsey* (2012) 54 Cal.4th 668, 731.) Nor does section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding whether to impose the death penalty, license the arbitrary and capricious imposition of the death penalty. (*Tuilaepa v. California*, *supra*, 512 U.S. at pp. 975–976; *Williams*, at p. 201; *People v. Valdez* (2012) 55 Cal.4th 82, 179; *People v. Thomas*, *supra*, 54 Cal.4th at p. 949.)

Neither the failure to impose a burden of proof on the ultimate question of life or death, nor the absence of an instruction that there is no burden of proof, is unconstitutional.  (*People v. Linton*, *supra*, 56 Cal.4th at p. 1215; *People v. McKinnon*, *supra*, 52 Cal.4th at p. 698; *People v. Taylor*, *supra*, 48 Cal.4th at p. 658.)  Nothing in the state or federal Constitution requires that the penalty jury (1) issue written findings, (2) unanimously agree on any particular aggravating circumstances, or (3) find that aggravating factors outweigh mitigating factors beyond a reasonable doubt.  (*People v. Homick*, *supra*, 55 Cal.4th at pp. 902–903; *People v. Valdez*, *supra*, 55 Cal.4th at pp. 179–180; *People v. Gamache*, *supra*, 48 Cal.4th at pp. 406–407.)  We have concluded as well that *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, *Blakely v. Washington* (2004) 542 U.S. 296, and *Cunningham v. California* (2007) 549 U.S. 270, cases which impose procedural constraints on factfinding in criminal trials, do not require re-examination of these conclusions:  "[T]he ultimate determination of the appropriateness of the penalty and the subordinate determination of the balance of the evidence of aggravation and mitigation do not entail the finding of facts that can increase the punishment for murder of the first degree beyond the maximum otherwise prescribed.  Moreover, those determinations do not amount to the finding of facts, but rather constitute a single fundamentally normative assessment [citations] that is outside the scope" of *Apprendi* and its progeny.  (*People v. Griffin* (2004) 33 Cal.4th 536, 595; see *People v. Lightsey*, *supra*, 54 Cal.4th at p. 731; *People v. McDowell*, *supra*, 54 Cal.4th at p. 443; *People v. Jones*, *supra*, 54 Cal.4th at p. 86.)

"CALJIC No. 8.88's use of the words 'so substantial,' its use of the word 'warrants' instead of 'appropriate,' . . . and its failure to instruct the jury on a 'presumption of life' does not render the instruction invalid."  (*People v. Rountree* (2013) 56 Cal.4th 823, 862–863; see *People v. Linton*, *supra*, 56 Cal.4th at

p. 1211; *People v. Homick*, *supra*, 55 Cal.4th at p. 904.)  Nor is CALJIC No. 8.85 flawed because it may include inapplicable aggravating or mitigating factors; the trial court was under no obligation to omit these.  (*People v. Williams*, *supra*, 56 Cal.4th at p. 698; *People v. Valdez*, *supra*, 55 Cal.4th at p. 180; *People v. McDowell*, *supra*, 54 Cal.4th at p. 444.)

Neither the state nor the federal Constitution requires intercase proportionality review, also known as comparative proportionality review. (*People v. Homick*, *supra*, 55 Cal.4th at p. 903; *People v. Valdez*, *supra*, 55 Cal.4th at p. 180; *People v. Tully*, *supra*, 54 Cal.4th at p. 1068.)  Nor does the equal protection clause require California to include in its capital sentencing scheme every procedural protection provided noncapital defendants.  (*Valdez*, at p. 180; *Tully*, at p. 1069; *People v. Thomas*, *supra*, 54 Cal.4th at p. 949.)

Trinh's argument that California's regular use of capital punishment violates international norms of human decency and thus the Eighth Amendment to the United States Constitution fails "because California does not employ capital punishment in such a manner.  The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies.  (E.g., Cal. Const., art. VI, § 11; §§ 190.1-190.9, 1239, subd. (b).)" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43–44; see *People v. Homick*, *supra*, 55 Cal.4th at p. 904; *People v. Tully*, *supra*, 54 Cal.4th at p. 1070; *People v. Thomas*, *supra*, 54 Cal.4th at p. 950.)  His argument that application of the death penalty in this particular case violates international law fares no better; it hinges on his previous assertions that his trial was infused with prejudicial constitutional violations.  As his trial was not, the conclusion that international norms were also

violated fails.  (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 62; *People v. Lopez* (2013) 56 Cal.4th 1028, 1084; *Homick*, at p. 904; *Tully*, at p. 1070.)

### III.  DISPOSITION

We affirm the trial court's judgment in its entirety.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KENNARD, J.**[*]

---

[*]    Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY LIU, J.**

The court properly rejects defendant's claim that the prosecutor's strike of Prospective Juror N.V. was motivated by discriminatory intent. (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).) I reach this conclusion based on an independent review of the record; as explained below, deference to the trial court's ruling is not appropriate in this case.

As today's opinion explains, the prosecutor gave credible, race-neutral reasons for dismissing N.V. (Maj. opn., *ante*, at pp. 27–32.) However, in denying defendant's *Batson* motion, the trial court relied not only on the prosecutor's stated reasons but also on its own assumption that it was "suspicious" and "very odd" for a person of Vietnamese descent not to have taken a special interest in a murder case involving a Vietnamese defendant. Clearly, that type of explanation for striking prospective jurors, which is based on "assumptions . . . which arise solely from the jurors' race," would be impermissible if proffered by the prosecutor. (*Batson*, *supra*, 476 U.S. at p. 98; see, e.g., *Kesser v. Cambra* (9th Cir. 2006) 465 F.3d 351, 362 (en banc) (lead opn. of Bybee, J.) [Native American prospective juror who worked for her tribe could not be dismissed based on prosecutor's assumption that such individuals are "more likely to 'associate themselves with the culture and beliefs of the tribe' "].) This is the second time in the past year that we have decided a capital case where the trial court, in denying a *Batson* claim, voiced its own assumptions about a protected group. (See *People v.*

1

*Williams* (2013) 56 Cal.4th 630, 652 (*Williams*) [in upholding prosecutor's strikes against five black women, trial judge said that in her experience " '[B]lack women are very reluctant to impose the death penalty; they find it very difficult no matter what it is' "].)  We cannot accord deference to *Batson* rulings informed by such impermissible generalizations.  (See *Williams* at p. 699 (dis. opn. of Werdegar, J.); *id.* at p. 717 (dis. opn. of Liu, J.).)

Here is the entirety of what the trial court said in analyzing the prosecutor's reasons for striking N.V.:  "Like another juror that [the prosecutor] excused, [N.V.] seemed to be very anxious to sit on this case.  One thing that [the prosecutor] didn't mention that I thought very odd was [N.V.] read about the case in the paper, and didn't give it any thought.  Which is very striking to me, he is Vietnamese, a little younger than Mr. Trinh, but single like Mr. Trinh.  I'm not so sure, in fact there is no evidence that he is taking care of his mother or anything like that.  I am concerned about excusing postal workers, that just once you start picking on occupations, I think we are all over the place."  "When [the prosecutor said that N.V. was] 'nonresponsive,' he was really just quick to give a yes or no answer to satisfy the question."  "And you [the prosecutor] questioned him quite a bit, he had no opinions about the death penalty.  He did say no strong feelings for either penalty."  "I agree [with the prosecutor], I even went beyond not only that he was overly eager to serve, I just find that strange he didn't take an interest in this case, very, very unusual.  In the Lisa Peng case, that entire community was talking, reading the paper, and on and on and on about the case.  Maybe he is just unique.  But if I were the prosecutor, I would be suspicious of a person who says no interest in the case after reading about it."

The trial court's mention of "the Lisa Peng case" appears to be a reference to the high-profile case of Lisa Peng, a Taiwanese woman living in Orange County who was tried three times for murdering her husband's Chinese mistress and their

2

infant son in 1993.  (See Pfeifer & Morin, *Jury Deadlocks in 3rd Double-Murder Trial:  Court:  A mistrial is declared for Taiwanese tycoon's wife accused of killing his mistress, son*, L.A. Times (June 19, 2001) p. B-1.)

Of the 24 lines of transcript comprising the trial court's analysis quoted above, 15 are devoted to its observation that it was "very odd" and "suspicious" for N.V., a Vietnamese-American, not to take special interest in defendant's case after reading about it in the newspaper.  These assumptions were compounded by the trial court's statement, unsupported by any evidence, that "that entire community" (presumably Chinese Americans or Asian Americans) "was talking, reading the paper, and on and on and on about the [Lisa Peng] case."  To his credit, the prosecutor immediately and clearly disavowed any reliance upon the trial court's observations.  But it is clear that these observations influenced the trial court's assessment of the credibility of the prosecutor's explanation that N.V.'s unresponsive views on the death penalty were suspect.

As today's opinion holds, defendant did not carry his burden of showing that the *prosecutor*'s motives were based on N.V.'s race.  But a "trial court's *Batson* rulings are not entitled to deference on appeal" where, as here, the ruling is informed by the trial court's own assumptions about a particular racial or ethnic group.  (*Williams*, *supra*, 56 Cal.4th at p. 717; see *Schuette v. Coalition to Defend Affirmative Action* (2014) 572 U.S. __, __ [188 L. Ed. 2d 613; 2014 U.S. LEXIS 2932 at p. *30] (plur. opn. of Kennedy, J.) ["this Court has rejected the assumption that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike . . . .' "].)

LIU, J.

3

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Trinh
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S115284
**Date Filed:** June 5, 2014
_____

**Court:** Superior
**County:** Orange
**Judge:** John J. Ryan


_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Gary D. Garcia, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gary D. Garcia
Deputy State Public Defender
221 Main Street, Tenth Floor
San Francisco, CA 94105
(415) 904-5600

Lynne G. McGinnis
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
(619) 645-2205