Filed 11/4/14  Contreras-Madrigal v. Hollywood Presbyterian Med. Center CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| AARON CONTRERAS-MADRIGAL, a Minor, etc., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> HOLLYWOOD PRESBYTERIAN MEDICAL CENTER, <br><br> Defendant and Respondent. | B250127 <br><br> (Los Angeles County Super. Ct. No. BC466778) |


APPEAL from a judgment of the Superior Court of Los Angeles County,

Gregory W. Alarcon, Judge.  Affirmed.

Nathaniel J. Friedman for Plaintiff and Appellant.

Horvitz & Levy, Robert H. Wright, Karen M. Bray; La Follette, Johnson,

De Haas, Fesler & Ames, Louis H. De Haas and Gillian N. Pluma for Defendant and

Respondent.

Aaron Contreras-Madrigal suffered injury in utero and manifested severe brain damage at birth. He filed a complaint against Hollywood Presbyterian Medical Center (HPMC) and others alleging negligence. A jury found that HPMC was not negligent. Plaintiff appeals the judgment challenging the trial court's rulings relating to expert witness testimony and to the hospital's failure to file an adverse event report with the Department of Health Services. We conclude that plaintiff has shown no prejudicial error and we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Factual Background*

Claudia Madrigal was approximately 29 weeks pregnant with twins when she experienced a leak of amniotic fluid on December 25, 2007. She was admitted to the hospital where it was determined that the amniotic sac holding one of the twins had ruptured. Her obstetrician and gynecologist, Dr. Josyln Gumbs, sought to prolong the pregnancy so as to reduce the significant risks presented by premature birth. Dr. Gumbs ordered tocolytics to prevent contractions, antibiotics to prevent infection, and a steroid to promote fetal lung development. Madrigal was hospitalized, and she and the fetuses were electronically monitored.

Dr. Gumbs consulted with Dr. Chmait, a perinatologist specializing in high-risk and multigestational pregnancies. Dr. Chmait recommended that the tocolytics be discontinued and that delivery be performed upon active labor, evidence of infection, or a " 'nonassuring fetal heart rate pattern.' "

2

Madrigal remained in the hospital and continued to be monitored until January 2, 2008. A nurse called Dr. Gumbs at home at noon that day to inform her that the fetal heart rate had decelerated but then recovered. She concluded that the deceleration did not reflect any injury due to lack of oxygen ("hypoxia") at that time. Dr. Gumbs ordered that Madrigal be given nothing by mouth in preparation for a possible C-section. At 2:00 p.m. that same day, Dr. Gumbs received another call from the same nurse reporting another deceleration and recovery. Dr. Gumbs again concluded that there was no immediate cause for alarm. She ordered the nurse to administer fluids intravenously. Madrigal complained to a nurse of mild abdominal pain at that time, but the nurse determined there were no contractions.

Dr. Gumbs called the hospital at 4:00 p.m. that same day and was told that Madrigal and the fetuses were stable. Later, she received a page at approximately 7:45 p.m. while dining at a restaurant. She spoke with a nurse who reported decelerations in the fetal heart rate, as well as uterine contractions. Dr. Gumbs ordered preparations for a C-section and left the restaurant immediately for the hospital.

A nurse reported further decelerations at 8:00 p.m., and a resident physician ordered an emergency C-section. Plaintiff was delivered by C-section at 8:17 p.m. Dr. Gumbs arrived in the operating room shortly thereafter.

Plaintiff suffered severe brain damage during the events surrounding his birth. He is microcephalic, unable to interact meaningfully with others, unable to feed himself or perform any tasks on his own, incontinent, and suffers spasticity and nearly complete

3

paralysis in all four extremities. His twin suffered no injury and has developed normally.

### 2. *Pretrial Proceedings*

Plaintiff filed a complaint against HPMC and others in August 2011 and filed a first amended complaint in March 2012.[1] He dismissed the other defendants before trial, dismissed some counts against HPMC, and proceeded to trial against HPMC on a single count for professional negligence.

Prior to the presentation of evidence, plaintiff filed a motion in limine to bar the defense from calling "any maternal fetal medicine specialist (i.e., perinatologist or ob-gyn) other than Dr. Michael Nageotte, M.D. at trial." Plaintiff's counsel filed a declaration stating that HPMC and Dr. Gumbs (then still a defendant) each had listed Dr. Nageotte in their designation of experts in addition to at least one other expert to testify on the same subjects. Plaintiff argued that Evidence Code section 723 authorized the trial court to limit the number of experts witnesses to be called. HPMC opposed the motion. The trial court denied the motion, stating that plaintiff could object at trial to any cumulative expert testimony.

Plaintiff also moved the trial court to judicially notice that HPMC had failed to file an "adverse event" report with the Department of Health Services, as purportedly required by Health and Safety Code section 1279.1, subdivision (a). Plaintiff argued that the matter was judicially noticeable under Evidence Code section 452,

---

[1] Plaintiff filed the complaint by and through his mother, Claudia Madrigal, as his guardian ad litem.

subdivisions (g) and (h). HPMC opposed the request. The trial court denied the request in an order filed on March 18, 2013. It stated that the sustaining of injury prenatally as the result of an infection was not an "adverse event" under the statute. It stated further that even if the incident did constitute an adverse event, the failure to file a report had nothing to do with proving medical malpractice, and evidence of the failure to file a report would confuse the jury, citing Evidence Code section 352.

3. *Expert Witness Testimony at Trial*

Plaintiff's theory at trial was that the physicians and nurses were negligent because they should have recognized signs of fetal distress and delivered plaintiff earlier, and that plaintiff's injuries were caused by reduced blood flow to the brain during the labor and delivery. HPMC's theory at trial was that plaintiff's injuries were caused by an infection inside the womb ("chorioamnionitis"). HPMC maintained that the fetus was afflicted with sepsis and suffered severe brain damage hours before the delivery, but showed no signs of fetal distress until shortly before birth. Thus, according to HPMC, plaintiff's injuries were not caused by any negligence on the part of either the physicians or nurses.

Dr. Ronald Gabriel, a pediatric neurologist, testified for plaintiff at trial on the issues of causation and the need for future medical care. Dr. Gabriel opined that plaintiff's heart was unable to pump enough blood to his brain from approximately 7:50 p.m. on the day of delivery, through the delivery at 8:17 p.m., and for approximately five minutes thereafter. He described this as "essentially . . . a heart attack" and stated that this was the cause of plaintiff's brain damage. Defense counsel

5

cross-examined Dr. Gabriel on his theory of causation and also on the rejection of his expert opinion by courts in the State of Michigan. Dr. John Phillips, an obstetrician and gynecologist, also testified for plaintiff, stating his opinion that the physicians and nurses failed to meet the standard of care required under the circumstances.

Dr. Paul Fisher, a pediatric neurologist, testified for the defense on the issue of causation. He opined that plaintiff suffered brain damage and other physical injury in utero as a result of sepsis, brought on by bacteria (E. coli) in his bloodstream. He stated that the sepsis resulted from chorioamnionitis, which had been present for several hours, and that plaintiff would have suffered severe brain damage even if he were delivered early in the afternoon.

Dr. Nageotte, the perinatologist, testified for the defense on both the standard of care and causation. He stated that Dr. Gumbs satisfied the standard of care by awaiting signs of labor or infection rather than delivering the twins immediately and prematurely. He also stated that the standard of care did not require the babies to be delivered by 7:00 p.m. on January 2, 2008, or earlier. He opined that the fetal infection was undetectable before delivery, and that the deceleration in the fetal heart rate prior to delivery was too brief to cause brain damage. He stated that the cause of injury was sepsis, and that plaintiff would have suffered severe brain damage even if he had been delivered five hours earlier.

Dr. Juan Felix, a placental pathologist, also testified for the defense on the causation issue. He stated that plaintiff's brain damage resulted from an E. coli infection in his bloodstream that caused fetal inflammatory syndrome, which led to

6

constriction of his cerebral blood vessels, causing a decrease in the flow of oxygenated blood to his brain ("cerebral ischemia"). He stated that inflammation in the umbilical cord showed that the infection was very well established and began at least 48 hours before delivery. He also stated that it was likely that severe brain injury occurred more than 12 hours before the delivery, even if there were no clinical signs of infection.

Dr. Richard Latchaw, a neuroradiologist, testified for the defense on the causation issue as well. He stated that plaintiff's brain damage was caused by a pervasive infection and that the deceleration in plaintiff's heart rate just before the delivery could not have caused such extensive damage.

Plaintiff objected at trial to certain testimony by Drs. Felix and Latchaw as cumulative of prior expert testimony. The trial court overruled those objections.

### 4. *Verdict and Judgment*

The jury returned a special verdict on April 4, 2013, finding by a vote of nine to three that HPMC and Dr. Gumbs were not negligent in the medical care and treatment of plaintiff. The trial court entered a judgment in favor of HPMC on May 23, 2013.

### 5. *New Trial Motion and Appeal*

Plaintiff moved for a new trial arguing that the trial court erred by denying his request for judicial notice, allowing defense counsel to cross-examine Dr. Gabriel regarding the rejection of his expert testimony by the Michigan courts, and improperly delegating authority to the court's research attorney or deputy clerk to make binding orders. The court denied the new trial motion.

Plaintiff timely appealed the judgment.

7

Plaintiff contends that the trial court erred by (1) refusing to judicially notice and admit evidence of HPMC's failure to file an adverse event report; (2) allowing defense counsel to cross-examine Dr. Gabriel on the exclusion of his opinion testimony in various Michigan cases; and (3) admitting cumulative testimony by HPMC's expert witnesses.

*DISCUSSION*

1.    *Plaintiff Has Shown No Prejudicial Error in the Trial Court's Refusal to Judicially Notice or Admit Evidence of HPMC's Failure to File an Adverse Event Report*

Plaintiff contends that the trial court's refusal to judicially notice, and admit into evidence, the fact that HPMC failed to file an adverse event report with the Department of Health Services potentially affected the jury's verdict. The court concluded that the incident did not constitute an "adverse event" under Health and Safety Code section 1279.1. It also stated that even if the incident did constitute an "adverse event," the failure to file a report had nothing to do with proving medical malpractice in this case, and that evidence of the failure to file a report would confuse the jury, citing Evidence Code section 352.

Evidence Code section 352 provides that a court may exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. A trial court has broad discretion when ruling on the admissibility of evidence under Evidence Code

section 352.  (*People v. Gurule* (2002) 28 Cal.4th 557, 654.)  A court abuses that discretion and commits error only if the ruling is arbitrary, capricious, or patently absurd.  (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

Health and Safety Code section 1279.1 states that a licensed health facility must timely report an "adverse event" to the Department of Health Services.  Subdivision (b) states that the term "adverse event" includes several enumerated events involving errors in medical care.  The final category states, "(7) [a]n adverse event or series of adverse events that cause the death or serious disability of a patient, personnel, or visitor." (*Ibid*.)

Plaintiff argues that HPMC's failure to file an adverse event report is relevant to the issue of medical negligence, citing *Housley v. Godinez* (1992) 4 Cal.App.4th 737 and *Vallas v. City of Chula Vista* (1976) 56 Cal.App.3d 382.  But those cases are readily distinguishable.  *Housley* involved a motor vehicle accident where the defendants asserted contributory negligence on the part of the plaintiff for violating the Vehicle Code by not wearing a seatbelt.  In *Vallas*, the plaintiff claimed that a police officer was negligent by violating department regulations, resulting in injury to the plaintiff.  In both cases, the alleged malfeasance arguably contributed to the damages that occurred. Here, the failure to file a report with the Department of Health Services took place, of necessity, after the injury occurred.  Whether or not a report was generated or filed could not have contributed to the injury in any way.  That does not mean the failure to file a report could have no probative value, but one would have to speculate as to why one was not filed, and what a report would have contained if it had been generated.

9

Against this speculation, the court would have to weigh the substantial danger of undue prejudice and consumption of time, and of confusing the issues or misleading the jury.

Evidence Code section 352, by its terms, calls for a court to exercise discretion. The discretion of a trial judge is broad, but not unlimited. It is subject to the limitations of legal principles governing the subject of its action, and may be reversed on appeal where no reasonable basis for the action is shown. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.]" (*Ibid.*) When it comes to appellate review of evidentiary rulings, discretion is abused "only when in its exercise, the trial court 'exceeds the bounds of reason, all of the circumstances before it being considered.' [Citation.]" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281 (*Shaw*).) It is the appellant's burden to establish that there has been "a clear case of abuse and [a] miscarriage of justice . . . . " (*Ibid.*)

Here, the probative value of HPMC's failure to file a report was speculative, while the danger of confusing the issues and misleading the jury was substantial, particularly in light of the dispute between the parties as to the cause of plaintiff's injury. Pursuant to Evidence Code section 352, the trial court could reasonably conclude that the risk of confusing the jury substantially outweighed any probative value. We find no abuse of discretion by the trial court in this regard.

2.      *Plaintiff Has Shown No Prejudicial Error Relating to the Cross-Examination of Dr. Gabriel*

Plaintiff contends the trial court erred by allowing defense counsel to cross-examine Dr. Gabriel on the rejection of his opinion testimony by courts in Michigan.  He argues that the fact that Dr. Gabriel's opinion testimony was previously excluded in Michigan cases was irrelevant and that such evidence was unduly prejudicial, misleading, and confused the issues, and therefore should have been excluded under Evidence Code sections 350 and 352.

As we have already noted, a trial court has broad discretion when it comes to its evidentiary rulings.  (*Shaw, supra*, 170 Cal.App.4th at p. 281.)  We can reverse a judgment based on the erroneous admission of evidence only if it is reasonably probable that the appellant would have obtained a more favorable result absent the error, so the error resulted in a miscarriage of justice.  (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b); *People v. Richardson* (2008) 43 Cal.4th 959, 1001.)

Plaintiff's counsel initially objected to questions regarding the rejection of Dr. Gabriel's testimony by Michigan courts on grounds of hearsay, relevance, calling for a legal opinion, "time wasting," and "inflammatory."  The trial court sustained those initial objections, stating that the questions were vague and should be rephrased. Defense counsel then asked whether Dr. Gabriel's opinions had been rejected by courts in Michigan and whether appellate courts had affirmed those rulings.  The trial court stated that the question should be divided in two and should begin with the trial court.

11

Defense counsel then stated, "Okay, the trial court. Your opinions were rejected by the trial courts, sir?

Plaintiff's counsel objected, "What does that mean? It's indefinite." The trial court stated, "Foundation for expertise, I assume. Overruled."

The following then ensued in the jury's presence:

Dr. Gabriel: "There was a dark day in Michigan justice for a few years which children did not get their day in court before a jury because of cover up or suppressed evidence. Hopefully, those days are behind us because of three separate rulings. The federal court in 2009 in Wood versus Hutzel, the Michigan State Supreme Court in 2010 in McCall versus Spectrum, and the Michigan State Supreme Court in 2011 in Vanslumberg versus Beaumont. Hopefully, those recent cases will put an end to this dark day in which children for a few years did not get their day in court before a jury. Thanks to the defense bar—thanks to some members of the defense bar in Michigan."

Defense counsel: "And, in fact, the Supreme Court in Michigan sustained the rejection of your opinions in those cases; true, sir?

Dr. Gabriel: "I just got through saying that the Supreme Court in the most two recent decisions have affirmed my opinion to go forward in a court of law to allow children to have their day in court before a jury and not to have medical opinion, mine and others, on behalf of children suppressed or covered up."

Defense counsel: "Well, your honor. I would like to mark all of these and have the court take judicial notice of these Supreme Court and appell[ate] court rulings which indicate to the contrary."

12

Plaintiff's counsel: "Your honor, I've never seen—"

The court: "Well, perhaps you can show them to opposing counsel and get some numbers for them. I still can't tell if the cases that the witness is talking about are the same cases. It sounded to me like he was talking about cases later. I don't know."

Dr. Gabriel: "They're later cases?"

The court: "Yeah, they're not the same cases."

Defense counsel: "Oh, they're later cases."

Dr. Gabriel: "Yeah, these are later cases putting a stop to was what [*sic*] happening for those few years."

Defense counsel: "Well, we're talking about, what, from 2004 to 2010, are we not?"

Dr. Gabriel: "I have no idea what the time frame is, but hopefully it's been put a stop to. Children in Michigan did not get a fair shake in those cases."

Defense counsel: "That's because the court rejected your testimony and your opinion, correct?"

Plaintiff's counsel: "It's pure argumentative. It's—"

The court: "Overruled."

Although the court overruled this last objection by plaintiff's counsel, the witness did not provide an answer, and defense counsel did not ask for one, moving on to a different topic.

The questions asked by defense counsel and the objections raised by plaintiff's counsel raise numerous issues. The only question presented on appeal, however, is

13

whether the trial court prejudicially erred by overruling the objections of plaintiff's counsel. Dr. Gabriel testified that despite "a dark day in Michigan justice for a few years" when "[c]hildren in Michigan did not get a fair shake," the Michigan Supreme Court and a federal court ultimately vindicated his opinion. He also stated that the two recent opinions by the Michigan Supreme Court "affirmed my opinion to go forward in a court of law to allow children to have their day in court before a jury and not to have medical opinion, mine and others, on behalf of children suppressed or covered up." Dr. Gabriel's testimony was hardly damaging to plaintiff's case; indeed, if anything, it was favorable. Thus, to the extent that the trial court overruled the objections by plaintiff's counsel, its rulings were not prejudicial.[2]

3. *Plaintiff Has Shown No Prejudicial Error in the Admission of Defense Expert Testimony*

Plaintiff contends testimony by Drs. Felix and Latchaw on causation was cumulative of prior expert testimony by Drs. Fisher and Nageotte, and should have been excluded. A trial court is vested with discretion to exclude cumulative testimony under Evidence Code section 352. (*People v. Rogers* (2013) 57 Cal.4th 296, 347.) Plaintiff also cites Evidence Code section 723, which provides that a court may limit the number of expert witnesses called by any party.

---

[2] We also reject plaintiff's argument that the trial court abused its discretion by refusing to allow plaintiff's counsel, in closing argument, to read from the Michigan opinions vindicating Dr. Gabriel's view. Those opinions were not in evidence, and Dr. Gabriel's testimony about them was unrebutted.

Causation in medical malpractice cases is often multifactorial. For example, if infection causes inflammation, which leads to vascular compromise, with the development of ischemia and/or decreased tissue perfusion, with resultant cellular damage and eventual brain injury, a party may present expert testimony from different medical subspecialties to discuss these various factors in order to present a full and complete picture of events to the jury. While a court retains discretion to limit the number of experts and may control the trial to avoid cumulative testimony, some overlap is sometimes unavoidable.

HPMC's expert witnesses each specialized in a different area of medicine, and each testified on causation from a different perspective. The court reasonably concluded that their testimony was not cumulative and that any overlap was not unduly prejudicial. (*People v. Trinh* (2014) 59 Cal.4th 216, 246.) We find no abuse of discretion in this regard.

*DISPOSITION*

The judgment is affirmed.  HPMC is entitled to recover costs on appeal.


*NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*


                                                        KUSSMAN, J.*

WE CONCUR:



KITCHING, Acting P. J.



ALDRICH, J.

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16