Filed 9/6/24  P. v. Williams CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B326140 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.BA482285) |
| v. | |
| TYREK WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver, Judge.  Affirmed.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield and William H. Shin, Deputy Attorneys General for Plaintiff and Respondent.

The jury found Tyrek Williams guilty of first degree murder (Pen. Code[1], § 187, subd. (a); count 1), three counts of attempted willful, deliberate, premeditated murder (§§ 664 & 187, subd. (a); counts 2-4), shooting at an occupied vehicle (§ 246; count 5), four counts of assault with a firearm (§ 245, subd. (a)(2); counts 6-9), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 10). The jury found true gang enhancements as to all counts (§ 186.22, subd. (b)(1)(B) [counts 6 10]; 186.22, subd. (b)(1)(C) [counts 1-5]), and personal and principal firearm use enhancements as to counts 1 through 9 (§ 12022.53, subds. (a)–(e) [counts 1-5]; §12022.5, subds. (a), (d) [counts 6-9]). The trial court set aside the gang enhancement findings in light of recent amendments to section 186.22 and dismissed the allegations in the interests of justice. The court sentenced Williams to 50 years to life in count 1; three consecutive life terms in counts 2, 3, and 4; two years four months in count 6; and three one-year terms in counts 7, 8, and 9. The court imposed and stayed sentences in counts 5 and 10 pursuant to section 654.

On appeal, Williams contends there was insufficient evidence to support his conviction for shooting at an occupied vehicle in count 5 and his four convictions for assault with a firearm in counts 6, 7, 8, and 9. He further contends that, even if supported by substantial evidence, his conviction for shooting at an occupied vehicle in count 5 must be reversed because the jury did not receive a written instruction on the offense.

We affirm the trial court's judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

## FACTS

### A.  *The Crimes*

Video footage from multiple surveillance cameras showed that on July 10, 2019, at around 11:26 p.m., Williams and another man got into a stolen silver Buick that was parked near a house associated with the Swans Bloods street gang.  The Buick travelled to West 74th Street, and at approximately 11:35 p.m. was slowly driving east.  As the Buick drove down the street, three individuals ran down the driveway at 158 West 74th Street and a fourth individual ran west on the sidewalk.

At the same time, A.A. was leaving her home at 144 West 47th Street in her Toyota Camry, four or five residences east of 158 West 47th Street.  The Camry was in the driveway when A.A. and her three minor children got into the vehicle.  A.A.'s three-year-old son was seated in the back driver's side seat.  Her six and seven-year-old daughters were next to him in the back seat.  A.A. backed the Camry out of the driveway so that it would ultimately face east.  As A.A. was backing onto the street she heard several gunshots being fired down the street.  The Buick drove around the Camry and the shooter fired at the Camry as the Buick passed it.  One bullet struck the back passenger window on the driver's side and exited the front passenger side window.  The glass shattered and landed inside the car, hitting A.A.'s son and causing minor injuries.  Another bullet hit the driver's side mirror.  A.A. did not see the car that shot at the Camry; she heard it go behind her.  A video recording taken from a camera located at the east end of the block depicted the Buick

3

driving around the Camry as the Buick was driving east on West 74th Street. The Camry pulled back into the driveway at 144 West 74th Street and was soon surrounded by people.

## B. *The Investigation*

Los Angeles Police Officer Walter Ramirez responded to a report of a shooting at 158 West 74th Street[2], as did Los Angeles Police Officer Daniel Jara. The officers encountered a total of four gunshot victims. M.A. had been shot in the face and was bleeding from the mouth, with a projectile stuck in his upper lip. T.H. had been shot in the left leg. Kevin Johnson was shot on the left side of his body, and ultimately died of his injuries. Another victim who refused to identify himself said that a bullet had grazed his side and showed Officer Ramirez his wound.

Officer Jara recovered three bullet casings from the street in the area near 158 West 74th Street where the four people were shot. All three casings were .22 caliber. In addition to A.A.'s Camry, which was in the driveway at 144 West 74th Street, a vehicle that was double-parked in front of 158 West 74th Street had been hit by gunfire and bore marks from four bullet impacts. The apartment building at 158 West 74th Street had three bullet impacts. Three other vehicles parked in front of 158 West 74th Street were also struck by the gunfire.

On July 15, 2019, the owner of the stolen Buick discovered it parked on the street. She reported the Buick recovered and took it to a car wash, where it was washed and vacuumed. After the cleaning, officers discovered several nine-millimeter casings

---

[2] Officer Ramirez was wearing a body camera. Footage from the camera was played for the jury.

4

inside the vehicle.  Officers also recovered a .22 caliber bullet casing in the vacuum collection system at the car wash.

In a search of the Swans's house in connection with a later shooting, officers discovered a trail of blood in the yard leading to a bloody potato chip bag inside a block wall.  The bag contained two .40 caliber firearms and a nine-millimeter firearm, all of which had magazines and appeared to be in functional working order.  Sample cartridges fired from the nine-millimeter firearm matched cartridges found at the scene of the July 10, 2019 shooting.  The .22 caliber bullet casings found at the scene and the car wash were all fired from the same gun, but the gun was not recovered.

## C.  *Statements to Undercover Agents*

After he was arrested, Williams talked to an undercover agent while waiting in a holding cell.  Williams told the undercover agent that his brother had been shot in the arm by the Seven Trays before the Fourth of July, and that the Swans "[w]ent right back on they ass."  Williams said that he "caught" one of the Seven Trays on July 10 at around 10:00 or 11:00 p.m. on 74th between Broadway and Main.  Williams and "two . . . other homies . . . went to go smack on them . . . [and] two of 'em got hit."  The driver in the shooting was a friend of Williams's who was later accidentally shot in his sleep and killed. Only Williams and one other person who committed the shooting were still alive.

Williams used a "deuce deuce" in the shooting.  Williams "[t]ook them first three shots, everybody went down."  He was certain he hit someone.  Then something happened to his gun.

Williams fired two more shots before stopping.  Williams's gun was destroyed after the shooting, so he knew the police did not find it.  He said the police "hit the trap house; they got the .40." The other "homey" was supposed to burn the car they used in the shooting, but he parked it on the street.

Codefendant J'son Morris was also arrested and spoke with an undercover agent while in a holding cell.[3]  He denied direct involvement in the shooting, but he knew the details.  They used "a nine and a .22."  Morris said one of the guns was destroyed and the other was taken by the police.  There were two shooters and a driver.  Morris did not get in the Buick.  He was in another car, which was burned after the shooting.[4]

## DISCUSSION

### A.      *Sufficiency of the Evidence (counts 5-9)*

Williams contends there was insufficient evidence to support his conviction for shooting at an occupied vehicle in count 5 and for committing assault with a firearm in counts 6, 7, 8, and 9.  He asserts that the jury's true findings on the personal firearm use enhancements in connection with those counts compel the conclusion that the jury found he was the direct perpetrator, a finding that he believes is incompatible with the

---

[3] The jury acquitted Morris of all charges.

[4] The car was a Dodge Charger that was used as a trailer car.  The car did not follow the Buick down West 74th Street.

6

evidence.[5]  He further argues that there is insufficient evidence that he possessed the mens rea necessary to be convicted as a direct aider and abettor.  Alternatively, Williams asserts that the personal firearm use enhancements must be stricken.  The contentions lack merit.

## 1.  The Evidence Did Not Preclude the Jury from Finding Williams Guilty as a Direct Perpetrator

Williams first argues he could not be convicted as a perpetrator in counts 5 through 9 because the People, in closing argument, relied upon his admission to the undercover agent that his firearm became inoperable after he fired five rounds, and are therefore bound by his statements.  Williams asserts that the prosecution presented no other evidence that he personally shot at the Camry; thus, his admission that the gun became inoperable must be taken as uncontradicted proof of the fact that he did not fire at the Camry.  We reject the contention.  Even if we assume (without deciding) that the People are bound by Williams's admission, the evidence does not preclude the possibility that Williams was the shooter.

Williams described the shooting to the undercover agent as follows:

"On the set.  As soon as I (Unintelligible) 'em.  Pow, pow.  Took the first three shots, everybody went down.  I was, like, oh, I

---

[5] Williams offers no authority or argument supporting his assertion that, by finding that he personally used a gun, the jury necessarily found that he was the perpetrator and could not have instead aided and abetted those offenses by personally using or discharging a firearm.

know I hit one.  On Blood, the homey shooting, too. (Untranslatable Sound.)  Busting—he got the .40 lemon squeeze (Phonetic).  I'm, like, oh, that motherfucka is (Unintelligible; Background Laughter).  Damn, Blood.

"On Blood, somehow, my—either he shot my gun or somebody else shot my deuce deuce and it fucken fucked up. Plus, I looked and I'm, like, oh, shit.  Shot two more times.  After that, I stopped, but the homey is talking about—he was, like, good thing you stopped, nigga 'cause that—that last shot you was finna take, if that shit would've backfired, it would've fucked you niggas up.  We had destroyed that motherfucka."

In his opening brief, Williams does not explain how his statements to the undercover agent showed that it was "physically impossible" for him to have fired at the Camry; he simply states that the other shooter[6] must have engaged in an "unplanned, spur-of-the-moment shooting at the Camry" in which Williams was not involved.  In the reply brief, Williams theorizes that the shooting at the Camry necessarily occurred after the victims in counts 1 through 4 had been shot and after Williams's gun became inoperable.  Williams's theory relies on his admissions to the undercover agent and his faulty assertion that the shots fired at the Camry were taken as the Buick approached it from the east.  Williams argues that after he fired at them, three of the targeted people ran down the driveway (south) and the fourth ran down the sidewalk heading west.  Given those facts, the bullets that hit the Camry could not have been stray gunfire because the Buick was positioned between the targeted

---

[6] Williams refers to Morris as the other shooter involved in the crimes.  Because Morris was acquitted on all counts, we refer to Williams's cohort as "the other shooter."

8

people and the Camry when the Camry was shot. Williams concedes that he and the other shooter shot at the victims in counts 1 through 4, but posits that he was unable to fire the .22 caliber firearm after the initial shooting because the gun was damaged. Thus, the other shooter must have shot at the Camry independently, in what was essentially a separate incident.

The ballistics evidence belies this theory, however. Contrary to Williams's statement of facts in the opening brief, A.A. testified that one bullet hit her driver's side mirror and another bullet entered through the rear driver's side window showering glass on her son, who was sitting on the driver's side of the vehicle in the back seat, and exited through the front passenger window. Given the positioning of the Camry—which was backing out and preparing to drive east—the only way this could have occurred is if the Buick was passing or had passed the Camry and the shooters were firing to the west in the direction of the four people who they targeted in the shooting. The evidence allows for the possibility that the Camry was hit by bullets intended to hit the victims in counts 1 through 4 and was not struck in an "unplanned, spur-of-the-moment shooting" aimed specifically at the Camry.

Second, even if Williams's statement that he fired three shots in the direction of the targeted victims in counts 1 through 4 is accepted as true, his admission to the undercover agent does not preclude the possibility that he fired his last two shots at the Camry. Williams did not tell the undercover agent where he aimed the final two shots or what he believed he hit. Nor did he tell the undercover agent that he stopped shooting before the other shooter stopped; only that he stopped shooting before he intended to. We give little weight to the suggestion that if

9

Williams had shot the Camry he would necessarily have told the undercover agent. Williams did not mention hitting anything other than his intended victims. Yet the prosecution presented evidence that bullets hit five cars (including the Camry) and an apartment building—some multiple times—making it highly likely that, regardless of where Williams believed he was aiming, he struck other objects in addition to the people targeted in the shooting. The evidence did not preclude the possibility that Williams was the perpetrator in counts 5 through 9.

## 2. Substantial Evidence Supports the Finding that Williams Directly Aided and Abetted the Offenses

Williams argues that the evidence is insufficient to support his convictions on an aiding and abetting theory of liability because there is not substantial evidence that he possessed the requisite mens rea. Williams misapprehends the mental state required to directly aid and abet the offenses.

### a. Direct aiding and abetting

"A person [directly] aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. (*People v. Beeman* [(1984)] 35 Cal.3d 547, 561 [(*Beeman*)].)" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) " '[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least

10

that required of the direct perpetrator.' ([*People v.*] *McCoy* [(2001)] 25 Cal.4th [1111,] 1118.) If the offense charged is a ' " 'specific intent' " ' crime, the accomplice must share the perpetrator's specific intent. (*Ibid.*) In contrast, if the charged offense is a general intent crime, the aider and abettor need only knowingly and intentionally facilitate the direct perpetrator's commission of the crime, without intending some additional result or consequence not required for the crime." (*People v. White* (2014) 230 Cal.App.4th 305, 317–318.) "[T]he fact that an aider and abettor must harbor a specific intent to aid the direct perpetrator of [a] general intent crime 'does not transform the underlying offense into a specific intent crime.' " (*Id.* at p. 318.)

### b. *Shooting at an occupied vehicle*

Section 246 provides in pertinent part: "Any person who shall maliciously and willfully discharge a firearm at an . . . occupied motor vehicle . . . is guilty of a felony . . . ." " ' [S]ection 246 is not limited to the act of shooting directly "at" an inhabited or occupied target. Rather the act of shooting "at" a proscribed target is also committed when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it.' " (*People v. White*, *supra*, 230 Cal.App.4th at p. 316, quoting *People v. Overman* (2005) 126 Cal.App.4th 1344, 1356.) " 'It is settled that a violation of section 246 is a general intent crime.' " (*People v. Iraheta* (2014) 227 Cal.App.4th 611, 620.)

Here, the prosecution introduced substantial evidence that satisfies the elements of shooting at an occupied vehicle.

11

Williams admitted to the undercover agent that he and the other shooter went to the scene of the crime to commit a shooting. Video recordings that captured the shooting depicted the scene as a neighborhood filled with residences and cars, such that a shooting would have the probable consequence of striking a car located within the range of the shooters' gunfire, such as the Camry. This was particularly likely in light of the fact that Williams and the other shooter were firing from a moving vehicle at multiple victims who were likely to—and did—disperse once the shooting commenced, which increased the range of their gunfire. Ballistic evidence showed that, in addition to the Camry, which was struck twice, four other cars and an apartment building were struck by the gunfire—some multiple times. The jury could readily infer from the nature of the scene and the numerous objects hit, that (1) the other shooter intended to fire his gun and was consciously indifferent to the probable consequence that he would likely be firing at occupied vehicles, including the Camry; (2) Williams was aware of the other shooter's intent and was also consciously indifferent to the probable consequence that the other shooter would fire at an occupied vehicle, including the Camry; and (3) Williams intended to aid and abet the other shooter and did so by firing a gun himself. (See *People v. White*, *supra*, 230 Cal.App.4th at p. 316.)

### c. *Assault with a firearm*

" '[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its

12

nature will probably and directly result in the application of physical force against another.' [Citation.] 'The mens rea [for assault] is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery. Although the defendant must intentionally engage in conduct that will likely produce injurious consequences, the prosecution need not prove a specific intent to inflict a particular harm. . . . The evidence must only demonstrate that the defendant willfully or purposefully attempted a "violent injury" or "the least touching," i.e., "any wrongful act committed by means of physical force against the person of another." [Citation.] In other words, "[t]he use of the described force is what counts, not the intent with which same is employed." [Citation.] Because the offensive or dangerous character of the defendant's conduct, by virtue of its nature, contemplates such injury, a general criminal intent to commit the act suffices to establish the requisite mental state. [Citations.]' [Citation.]" (*People v. Golde* (2008) 163 Cal.App.4th 101, 108–109.) "[N]o subjective intent to injure a particular victim is required. Rather, a defendant's intended acts are evaluated objectively to determine whether harm to a charged victim was foreseeable." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1629.)

Substantial evidence also supports a finding that Williams aided and abetted assault with a firearm. As we have already discussed, the prosecution introduced evidence that Williams and the other shooter went to the scene with the intent of shooting the victims in counts 1 through 4, and that Williams knew of the other shooter's intent to shoot the targeted victims. The force employed was gunfire, which " 'by its nature will probably and directly result in injury to another[.]' " (*People v. Golde, supra,*

13

163 Cal.App.4th at p. 108.)  The other shooter was firing in a residential neighborhood with many cars; it was objectively foreseeable that the victims could be harmed, regardless of whether they were the intended targets.  Finally, Williams aided and abetted the shooter by shooting with him.

3.  **The Jury Did Not Need to Decide Whether Williams Was a Perpetrator or a Direct Aider and Abettor**

Williams next argues that, even assuming he *could* have been the perpetrator in counts 5 through 9, the evidence was insufficient for the jury to determine whether he, or the other shooter, or both shooters, fired at the Camry, which requires that the convictions be reversed.  Alternatively, if the convictions are not reversed, Williams argues that the gun use enhancements must be reversed for the same reason.  He cites to *People v. Allen* (1985) 165 Cal.App.3d 616 (*Allen*), *People v. Botello* (2010) 183 Cal.App.4th 1014 (*Botello*), and *People v. Smith* (2005) 135 Cal.App.4th 914 (*Smith*) to support these arguments.  None of these cases assist Williams.

In *Allen, supra*, 165 Cal.App.3d at pages 621 and 626, evidence was presented that the two defendants were in the same room with the victim when the victim was shot twice with the same gun and killed.  There were no eyewitnesses to the shooting.  (*Id*. at p. 625.)  The jury convicted both defendants of murder and found that both defendants personally used a firearm in the commission of the offense.  (*Id*. at p. 621.)  The defendants argued that their convictions were not supported by substantial evidence because it was impossible to know which defendant was

14

the shooter.  (*Id*. at p. 625.)  Alternatively, they argued that the personal firearm use enhancements must be reversed because only one firearm was used, and it was impossible to know which defendant wielded the weapon.  (*Id*. at p. 626.)

The Court of Appeal affirmed the murder convictions, stating that "[u]nder the[] circumstances [of the case], it is immaterial that the evidence was silent as to which defendant actually shot [the victim]; it is virtually inconceivable that the one who did *not* shoot him did not aid and abet the shooting . . . ." (*Allen*, *supra*, 165 Cal.App.3d at p. 626.)  The court described the evidence against the defendants as follows:  "Direct testimony placed both Allen and Brewer in the kitchen when Gregory was shot there.  The fact that he was shot immediately after addressing the defendants in a friendly manner strongly suggests that whichever defendant killed him had a preconceived intent to do so.  The immediate aftermath, in which *both* defendants—without further ado—attacked Cheryl and shared in the intent to shoot at Taggra, strongly suggests a prior agreement to kill Gregory and all witnesses.  Indeed, in their arguments to the jury, both defendants acknowledged that the evidence showed a preconceived 'assassination' plot."  (*Id*. at pp. 625–626.)  The court found there was insufficient evidence to support the personal firearm use enhancements, however, because whether one defendant or the other or both personally used the firearm was conjecture.  (*Id*. at p. 626.)

In *Botello*, *supra*, 183 Cal.App.4th at pages 1016 through 1018, the People presented evidence that the victims were killed in a drive-by shooting by a single shooter sitting in the front passenger seat of a vehicle.  A witness identified twin brothers as the driver and front seat passenger, but could not distinguish

15

between them and thus could not say which twin shot the victim. (*Id*. at p. 1018.) On appeal, the defendants argued that the evidence was insufficient to support the murder convictions and personal firearm use enhancements. (*Id*. at p. 1016.) The People conceded that there was insufficient evidence to support the firearm use enhancements.[7] (*Id*. at p. 1022.) The Court of Appeal agreed that the personal gun use enhancements must be reversed because the witness could not say which twin fired the gun. (*Ibid*.) The appellate court affirmed the murder convictions in an unpublished section of the opinion. (*Id*. at p. 1017.)

In light of the evidence presented in Williams's case, it is irrelevant whether Williams was a perpetrator of the offenses or a direct aider and abettor, because "it is virtually inconceivable that [if Williams] did *not* shoot [at the Camry] [he also] did not aid and abet the shooting . . . ." (*Allen, supra*, 165 Cal.App.3d at p. 626.) Williams admitted that he and the other shooter both intended to shoot the victims in counts 1 through 4. Regardless of whether they intended to shoot other victims, it was objectively foreseeable that they could harm the victims in counts 5 through 9, given that the crime scene was a residential neighborhood. Williams admitted that both he and the other shooter actually fired at the victims in counts 1 through 4, and were armed with different guns. Officers recovered casings from two different guns, many of which were compatible with the .22 caliber firearm Williams claimed to have used. The men fired from the same moving vehicle and would have been equally aware of the

---

[7] The People instead argued that the enhancements could be imposed under section 12022.53, subdivision (e) (*Botello, supra*, 183 Cal.App.4th at p. 1022), an issue that is not pertinent to this case.

16

probable consequence of striking an occupied vehicle in their line of fire.  There is simply no scenario in which Williams was not guilty either as a perpetrator or as a direct aider and abettor.

The Court of Appeal's conclusions in *Smith*, *supra*, 135 Cal.App.4th 914, do not persuade us otherwise.  There, when analyzing whether the jury's special circumstance finding was supported by substantial evidence, the court determined that insufficient evidence was offered to show that the defendant was the actual killer or that the actual killer was aided and abetted by anyone with the intent to kill.  (*Id*. at p. 927.)  The court concluded that, even assuming that the evidence was sufficient, it consisted of "a single DNA allele on a bathroom towel that was consistent with both [the defendant] and [another man suspected to be involved]."  (*Ibid*.)  Which of the two men—if either—aided and abetted the actual killer was a matter of conjecture.  (*Ibid*.)

*Smith* was unlike the present case in that there was only " 'very, very weak' " evidence that *anyone* aided and abetted the actual killer, and no evidence that the actual killer was aided and abetted by *two people*.  (*Smith*, *supra*, 135 Cal.App.4th at p. 927.)  Here, substantial evidence links Williams to the crimes.  The evidence demonstrated that *two men* committed the shootings, and that Williams was one of those men.  Williams admitted that he and another person were actual shooters, and that they used different guns.  Officers recovered two calibers of bullet casings, one of which matched the caliber of the firearm that Williams claimed to have used.  Williams was necessarily either the perpetrator or an aider and abettor.

Finally, with respect to the personal firearm use enhancements, the facts of Williams's case are readily distinguishable from those in *Allen* and *Botello*.  In those cases,

17

only one firearm was used and there was no evidence regarding which defendant used it. Here, there was evidence that two firearms were used, and that Williams used the .22 caliber firearm exclusively—Williams told the undercover agent that he "took the first three shots" and that after that he was only able to fire two more rounds because the gun became inoperable. Unlike *Allen* and *Botello*, the Camry was hit by two bullets that could have been fired from either gun or both, which left open the possibility that both shooters could have been perpetrators. Finally, it is not contested that Williams used a firearm—that he did not use the firearm either as a perpetrator of the crimes in counts 5 through 9 or as a direct aider and abettor is inconceivable. Substantial evidence supports the personal firearm use enhancements.

## B. *Omission of Written Instruction on Shooting at an Occupied Vehicle*

### 1. Proceedings

Prior to orally instructing the jury, the trial court advised the jurors that the court would display the instructions as they were read. The court stated that if it noticed any errors, the court would correct the errors before deliberations, and the jury was to "follow the instructions in their final form as given to [the jurors] in the jury room."

As pertinent here, the trial court read CALCRIM No. 335, which instructs regarding accomplice testimony when there is no dispute whether the witness is an accomplice. Immediately following the oral instruction, in sidebar, counsel objected to

18

inclusion of CALCRIM No. 335. The court granted counsel's request to remove CALCRIM No. 335 from the instructions and admonished the jury that the accomplice testimony instruction would not be included in the written instructions and that the jury was not to consider it for any purpose. CALCRIM No. 335 was omitted from the written instructions.[8]

The trial court also read CALCRIM No. 400, which instructed on basic principles of aiding and abetting. The court's oral reading of the instruction included the final optional bracketed sentence contained in the standard instructions: "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes during the commission of the first crime." After court recessed, counsel requested that the trial court strike the optional sentence from the written instructions. The trial court granted the request and reiterated that it had instructed the jury to follow the instructions in their final written form. The court did not further admonish the jury. The optional sentence was stricken from the final written instruction provided to the jury for deliberations.

Finally, the court orally instructed the jury under CALCRIM No. 965 regarding the elements of shooting at an occupied vehicle.[9] CALCRIM No. 965 is not contained in the

---

[8] Williams's reply brief inaccurately states that a paragraph was omitted from CALCRIM No. 335. The instruction was withdrawn in its entirety.

[9] As given, CALCRIM No. 965 states: "The defendants are charged in count five with shooting at an occupied motor vehicle, in violation of Penal Code section 245 [*sic*]. [¶] To prove that a

19

written instructions in the record on appeal.  It appears the instruction was inadvertently omitted from the written instructions provided to the jury.

## 2. Analysis

Williams argues that the omission of CALCRIM No. 965 from the written instructions requires reversal of his conviction for shooting at an occupied vehicle (count 5) because it removed from the jury's consideration the requirement that the defendant shot willfully and maliciously.  Williams argues that the omission of an element of a crime from the instructions is constitutional error that requires reversal unless it is harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)  The People concede that the trial court erred, but argue that the error is statutory and need not be reversed because it is not reasonably probable that Williams would have obtained a more favorable result if CALCRIM No. 965 had been included in the written instructions.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Williams cites *Neder v. United States* (1999) 527 U.S. 1, 8–15, which held that omission of an element of an offense from an

---

defendant is guilty of this crime, the People must prove that, one, the defendant willfully and maliciously shot a firearm; and two, the defendant shot the firearm at an occupied motor vehicle.  [¶] Someone commits an act willfully when he or she does it willingly or on purpose.  [¶] Someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to disturb, annoy or injure someone else.  [¶] A motor vehicle includes a passenger vehicle.  [¶] The term 'firearm' is defined in another instruction to which you should refer."

instruction is constitutional error and reviewable under *Chapman*. Williams mischaracterizes the error, however. Here, an element of the offense was not omitted from the instructions. The trial court properly orally instructed the jury on all the elements of shooting at an occupied vehicle; it failed to provide a written copy of the instruction to the jury. Omission of a written instruction that was given upon the jury's request is an error of state law,[10] subject to harmless error review under *Watson*. (*People v. Trinh* (2014) 59 Cal.4th 216, 235.) Reversal under *Watson* is only warranted if there is "a reasonable probability of a more favorable outcome had the jury received [a] written cop[y] of [the instruction]." (*Ibid*.) Assuming that omission of CALCRIM No. 965 was error, we conclude the error was harmless.[11]

Williams claims that the omission of CALCRIM No. 965 from the written instructions was not harmless. He argues that the jury would have disregarded the instruction because the trial court orally instructed that it was bound to follow the written

---

[10] Section 1093, subdivision (f), provides in relevant part: "Upon the jury retiring for deliberation, the court shall advise the jury of the availability of a written copy of the jury instructions. The court may, at its discretion, provide the jury with a copy of the written instructions given. However, if the jury requests the court to supply a copy of the written instructions, the court shall supply the jury with a copy."

[11] Section 1093, subdivision (f), applies when the jury requests that the court provide a written copy of the instructions. Here, there was no such request, but the court informed the jury that it would receive a copy of the instructions and provided the remainder of the instructions. We assume error for the sake of discussion, and do not decide the issue.

instructions if there was any conflict with the court's oral instructions. Williams asserts that because (1) CALCRIM No. 335 was omitted and the jury was admonished not to consider it for any purpose, and (2) the last sentence of CALCRIM No. 400 was stricken without further admonishment, the jury would have been confused regarding the omission of CALCRIM No. 965 and would have likely concluded that it should ignore the court's instruction on shooting at an occupied vehicle as well.

We disagree. The trial court struck CALCRIM No. 335 in its entirety immediately after it was given and specifically admonished the jury not to consider it. The jury received no such admonition from the court with respect to CALCRIM No. 965. The jury was properly orally instructed on the elements of shooting at an occupied vehicle, and none of the written instructions conflicted with the court's oral instruction. (See *People v. Trinh, supra*, 59 Cal.4th at pp. 234–235 [omission of written instructions does not nullify orally read instructions that accurately state the law].) The jury did not submit any questions to the court regarding shooting at an occupied vehicle. There is no reason to believe that the jury did not understand and follow the oral instruction given. (See *id.* at p. 235 [holding error harmless where two instructions were omitted from written instructions and jurors received accurate oral instructions].)

We reject Williams's argument that the fact that the trial court struck the final sentence of CALCRIM No. 400 from the written instructions without further advisement to the jury that it had done so introduced confusion. The court specifically advised the jury it would correct any erroneous oral instructions in the final written instructions, and that to the extent that there

22

was a conflict, the jury should follow the written instructions. Striking the final sentence of CALCRIM No. 400 created a conflict between the oral and written instructions that we presume the jury resolved in favor of the final written instruction, as it was admonished to do.  (See *People v. Trinh*, *supra*, 59 Cal.4th at p. 235 [reviewing court presumes that jury understands and correctly applies instructions].)  There was no such conflict with respect to CALCRIM No. 965.  The oral instruction was not contradicted by any written instruction.

## DISPOSITION

We affirm the trial court's judgment.
NOT TO BE PUBLISHED.


MOOR, J.


We concur:


BAKER, Acting, P. J.


KIM, J.